Christopher MASONOFF, Sr., Robert
Foster, and Anthony Smith,
Plaintiffs,

v.

Larry DuBOIS, Lynn Bissonnette, and
Richard G.J. Grelotti, Defendants.

Civ. A. No. 94–10133–RCL.

United States District Court,
D. Massachusetts.

Sept. 11, 1995.

Christopher Masonoff, Sr., Norfolk, MA, pro se.

Herbert E. Zimmerman, Wayland, MA, for plaintiff.

Robert Foster, Bridgewater, MA, pro se.

Anthony Smith, Shirley, MA, pro se.

Michael C. Donahue, Gelerman & Cashman, Dedham, MA, for Larry DuBois, Lynne Bissonette and Richard G.J. Grelotti.

## OPINION

LINDSAY, District Judge.

This class action challenges certain conditions of confinement at the Southeast Correctional Center ("SECC"), located in Bridgewater, Massachusetts. Specifically, the plaintiffs, present and past inmates at SECC, claim that unsanitary toilet facilities, a fire hazard, contaminated drinking water and exposed asbestos exist at SECC, and that the existence of these conditions violates their right under the Eighth Amendment to the United States Constitution to be free from cruel and unusual punishment. The plaintiffs seek permanent injunctive relief and damages. The defendants are Larry DuBois, the Massachusetts Commissioner of Corrections, Lynn Bissonnette, Superintendent of SECC, and Richard Grelotti, the former administrator of the Bridgewater Complex of which SECC is a part.

In an earlier order, this court certified a plaintiff class, consisting of all inmates confined at SECC at any time during the period from January 1, 1977 to the present. The court also bifurcated the action, so that only the claims for injunctive relief are addressed in this first phase.

Now before the court is the plaintiffs' motion for summary judgment. The court grants the motion, in part, as to certain Eighth Amendment claims and denies the motion as to other claims, as explained below.

## I. Standard

■■■ "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 7–8 (1st Cir.1990), quoting Fed. R.Civ.P. 56(c). "Not every factual controversy bars a litigant's access to the Rule 56 anodyne: '[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" *Medina–Munoz*, 896 F.2d at 8, *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis in the original). "A 'genuine' issue is one that must be decided at trial because the evidence, viewed in the light most flattering to

the nonmovant, ... would permit a rational factfinder to resolve the issue in favor of either party." *Medina–Munoz,* 896 F.2d at 8 (citations omitted). The First Circuit has "interpreted Rule 56 to mean that '[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve.'" *Medina–Munoz,* 896 F.2d at 8, *quoting Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz,* 896 F.2d at 8. Furthermore, "[i]t is well established that 'a mere challenge to the credibility of a movant's witnesses without any supporting evidence' does not raise a trialworthy issue of fact." *Favorito v. Pannell,* 27 F.3d 716, 721 (1st Cir.1994), *quoting Moreau v. Local Union No. 247,* 851 F.2d 516, 519 (1st Cir.1988).

## II. *Facts and Law*

The court will begin by addressing the defendants' principal argument in opposition to the plaintiffs' motion for summary judgment, namely, that a prior state court judgment bars this action. The court will then present the facts which are explicitly undisputed. The court will next set forth the standard governing an Eighth Amendment claim generally. Next, as to each allegedly unconstitutional condition, the court will present the law, each side's submission on that issue, and this court's conclusions.

### A. *Effect of State Court Judgment*

The defendants argue that the judgment of the Massachusetts Superior Court (Plymouth County, Hely, J.) in *Langton v. Fair* should have preclusive effect in this case, under the doctrines of both claim and issue preclusion. This court rejects the defendants' argument.

The state actions in *Langton v. Fair* were five consolidated cases filed by inmates who were not parties to this federal suit and were not parties to the several federal suits which preceded this action.[1] The consolidated cases were tried in the Superior Court in March of 1991. The issues raised by the plaintiffs in this federal action regarding sanitation facilities, water quality, fire safety, pest infestation, and asbestos exposure were fully litigated in the consolidated action, and judgment entered for the defendant Commissioner of Correction and other state officials.

■ Because the judgment which the defendants believe to be a bar to the present suit was rendered by a Massachusetts state court, this court must look to Massachusetts law to determine the preclusive effect of that judgment. *Migra v. Warren City School Dist. Bd. of Ed.,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *Hermes Automation Technology, Inc. v. Hyundai Elec. Indus.,* 915 F.2d 739, 750 (1st Cir.1990).

■ Under Massachusetts law, claim preclusion "generally applies only to actions between parties to the prior litigation, or between a party to the prior litigation and a person whose interests were represented by a party to the prior litigation." *Hermes,* 915 F.2d at 750, *citing Mongeau v. Boutelle,* 10 Mass.App.Ct. 246, 249–50, 407 N.E.2d 352 (1980). It is undisputed that the named plaintiffs here were not the plaintiffs in the state court actions, and that the state court plaintiffs did not purport to represent anyone other than themselves. Therefore, claim preclusion does not apply.[2]

■ Nor does issue preclusion apply. The situation here fits neither the paradigm of nonmutual defensive issue preclusion,

---

1. The five consolidated actions which comprised *Langton* were: *Langton v. Fair,* Plymouth 86–24234; *Smith v. Johnston,* Suffolk 88–4477; *Rockwell v. Vose,* Suffolk 90–4420; *Khaliq v. Fair,* Plymouth 86–24841; and *Belbin v. Vose,* Plymouth 89–2246A. The Memorandum of Decision was filed on May 20, 1991. Judgment was entered on December 13, 1992.

2. Of course, the plaintiffs in *Langton v. Fair* have had their day in court, are bound by the judgment in that case, and are not entitled to the benefit of any judgment rendered in this case, even though they may be members of the plaintiff class certified here. *Restatement (Second) of Judgments* § 42 (1982).

where "a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant," *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 4, 99 S.Ct. 645, 649 n. 4, 58 L.Ed.2d 552 (1979), nor the paradigm of nonmutual offensive issue preclusion, where "the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party." *Id.*[3] Rather, in this case, defendants in a second case, who were also the defendants in the first case, are attempting to preclude individuals who were complete strangers to the first action from relitigating issues which the defendant won in the first action. "[S]o far Massachusetts has not permitted a defendant to bind a plaintiff by the defendant's previous victory in another case presenting the same issue." *Lynch v. Merrell–National Labs.*, 830 F.2d 1190, 1192 (1st Cir.1987). Furthermore, "[i]t is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard." *Parklane*, 439 U.S. at 327 n. 7, 99 S.Ct. at 649 n. 7.

Accordingly, neither claim nor issue preclusion applies. The defendants' attempt to bar the plaintiffs from proceeding with this case on the basis of the state court judgment therefore fails.

### B. *Undisputed Facts.*

The explicitly undisputed facts which follow are derived from the plaintiffs' amended complaint and the defendants' answer.

### 1. *SECC in General*

SECC is a medium-security prison located in Bridgewater, Massachusetts. The major buildings were erected at various times between the mid–1880's and the mid–1910's. SECC is part of a complex which includes the State Hospital, the Treatment Center for the Sexually Dangerous and the Old Colony Correctional Center.

### 2. *The Toilets*

Many of the inmates, including the inmates in the Central Housing and the East Housing units, are housed in cells without running water or flush toilets. Each cell in these units is equipped with a Sears "Pak–a–Potti" chemical toilet, a pitcher of water, and a handwashing basin. During approximately ten hours per day, the inmates' only toilets are the chemical toilets. At other times, the inmates have access to toilets in SECC's "shanty."[4]

Each day, the inmates empty the contents of their chemical toilets into a "slop sink." There are six slop sinks in the Central Housing Unit and seven slop sinks in the East Housing Unit.

### 3. *Locks on Cells; Sprinkler System*

The locks on the cell doors in the Central and East Housing units are manually operated. There is no sprinkler system in these units.

### C. *General Eighth Amendment Standard.*

 This court discussed the Eighth Amendment standards governing prison conditions in its opinion dealing with access to SECC's shanty. *Masonoff v. DuBois*, 853 F.Supp. 26, 28–29 (D.Mass.1994):

'[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.' *Helling v. McKinney*, [—— U.S. ——, ——], 113 S.Ct. 2475, 2480, [125 L.Ed.2d 22] (1993). An Eighth Amendment claim has 'both an objective component (was there a sufficiently serious deprivation?) and a subjective component (was the deprivation brought about in wanton disregard of the inmate's rights?).' *DesRosiers v. Moran*, 949 F.2d 15, 18 (1991), *citing Wilson v. Seiter*, 501

---

**3.** Massachusetts does not permit nonmutual offensive issue preclusion, a doctrine recognized by the United States Supreme Court in *Parklane*, 439 U.S. at 322, 99 S.Ct. at 645. *See Whitehall Co. v. Barletta*, 404 Mass. 497, 536 N.E.2d 333, 336 (1989).

**4.** The shanty is SECC's "Central Recreation Room." It contains nine showers, ten flush toilets, three urinals and fourteen sinks.

U.S. 294, 298 [111 S.Ct. 2321, 2324, 115 L.Ed.2d 271] (1991). As to the objective component, a court must measure the challenged conditions of confinement against 'the evolving standards of decency that mark the progress of a maturing society.' *Rhodes v. Chapman,* 452 U.S. 337, 346, [101 S.Ct. 2392, 2399, 69 L.Ed.2d 59] (1981), *quoting Trop v. Dulles,* 356 U.S. 86, 101, [78 S.Ct. 590, 598, 2 L.Ed.2d 630] (1958). Those prison conditions which 'deprive inmates of the minimal civilized measure of life's necessities' constitute objective violations of the Eighth Amendment's prohibition of cruel and unusual punishment. *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399. *See Wilson,* [501 U.S. at 298], 111 S.Ct. at 2324.

■ To show deliberate indifference, the subjective aspect of the Eighth Amendment test, "the plaintiffs must show that the officials have 'actual knowledge of impending harm, easily preventable.'" *Masonoff v. Du-Bois,* 853 F.Supp. at 29 (D.Mass.1994), *quoting DesRosiers v. Moran,* 949 F.2d 15, 19 (1st Cir.1991). The First Circuit has analogized this test to the "recklessness" test in criminal law, as opposed to the concept of recklessness in tort law. *DesRosiers,* 949 F.2d at 19.

> The cases also indicate that, when liability for serious harm or death ... is at issue, a plaintiff must demonstrate 'deliberate indifference' by showing (1) an unusually serious risk of harm ... (2) defendant's actual knowledge of (or, at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk.

*Manarite v. City of Springfield,* 957 F.2d 953, 956 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 113, 121 L.Ed.2d 70 (1992).

D. *Specific Claims*

　　1. *The Chemical Toilets*

　　　　a. *Law*

　　　　(i) *Sanitation*

■ This court has stated:

Having a sanitary place to dispose of one's bodily waste is one [of the] 'minimal civilized measure of life's necessities.' [A judge in this district] has held that '[a]n inmate's constitutional right to adequate and hygienic means to dispose of his bodily wastes [is] clearly established.' *Strachan v. Ashe,* 548 F.Supp. 1193, 1205 (D.Mass. 1982). The same court, in finding an Eighth Amendment violation, has also noted the health hazards brought about by the '[d]eprivation of elementary sanitary facilities.' *Bel v. Hall,* 392 F.Supp. 274, 277 (D.Mass.1975). *See also Dimarzo v. Cahill,* 575 F.2d 15 (1st Cir.1978), *cert. denied,* 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978).

*Masonoff v. DuBois,* 853 F.Supp. 26, 29 (D.Mass.1994). *See also Hutto v. Finney,* 437 U.S. 678, 686–87, 98 S.Ct. 2565, 2571–72, 57 L.Ed.2d 522 (1978) ("[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of 'grue.' [sic] might be tolerable for a few days and intolerably cruel for weeks or months"); *Whitnack v. Douglas County,* 16 F.3d 954, 958 (8th Cir.1994) ("[R]easonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs of a prisoner protected by the Eighth Amendment"); *Howard v. Adkison,* 887 F.2d 134, 137 (8th Cir.1989) ("[I]nmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time"); *Green v. Ferrell,* 801 F.2d 765, 771 (5th Cir.1986) ("Jails must provide 'reasonably adequate' sanitation"); *Ramos v. Lamm,* 639 F.2d 559, 566–570 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981) (Sanitation is a core aspect of Eighth Amendment analysis); *Thomas v. Brown,* 824 F.Supp. 160, 163–64 (N.D.Ind.1993) (Lack of running water in cell, in and of itself, may constitute sufficiently serious deprivation under Eighth Amendment); *Toussaint v. McCarthy,* 597 F.Supp. 1388, 1411 (N.D.Cal.1984) ("A sanitary environment is a basic human need that a penal institution must provide for all inmates.")

In *Strachan v. Ashe,* 548 F.Supp. 1193 (D.Mass.1982), Judge Freedman of this district held that prison authorities had violated an inmate's Eighth Amendment rights by confining him in an isolation cell which had

no toilet or running water. The inmate, who resided at Hampden County House of Corrections, had been furnished with a bucket in which to deposit his bodily wastes. The court noted that these conditions violated the state's regulations, which require plumbing in each cell, and that while the failure to conform to state regulations does not constitute a per se constitutional violation, the state regulations do provide a source of "objective indicia" which reflect the standards of society. *Id.* at 1202. The court quoted with approval a Second Circuit case for the proposition that "[c]ausing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted." *Id., quoting LaReau v. MacDougall,* 473 F.2d 974, 978 (2nd Cir. 1972), *cert denied,* 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973).

In *Bel v. Hall,* 392 F.Supp. 274 (D.Mass. 1975), Judge Garrity of this district adopted a master's report concerning conditions at the so-called BX Unit of MCI Bridgewater. "The crucial findings regarding sanitation were the insufficiency of toilets available to inmates in the BX Unit during the daytime and the fact that they were required to use chamber pots while confined to their cells during the nighttime." Judge Garrity stated:

> Deprivation of elementary sanitary facilities automatically and without having disobeyed any of the institutional rules is not only hazardous to health but connotes an institutional disdain for the inmates which is bound to have a cumulative effect and to produce in them feelings of depression and despair. These feelings were reflected in the testimony of several inmate witnesses. In addition to the lack of toilets in the cells, the grossly unsanitary conditions involved the emptying of the chamber pots, the shortage and condition of places at which to wash up and toilet facilities elsewhere in the unit, the uncleanliness of the cooking and dining facilities, the disrepair of the shower facilities, and other conditions described in the master's report.

*Id.* at 277.

### (ii) *Health*

■ " '[D]eliberate indifference to serious medical needs of prisoners' violates the [Eighth] Amendment because it constitutes the unnecessary and wanton infliction of pain contrary to contemporary standards of decency." *Helling v. McKinney,* — U.S. —, —, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993), *quoting Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). In *Helling v. McKinney,* the Supreme Court ruled that exposure to secondhand cigarette smoke may constitute cruel and unusual punishment under the Eighth Amendment, even if the illness resulting from such exposure does not occur for several years. According to the court:

> We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year.... [A] prison inmate ... could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery....
>
> [T]here may be situations in which exposure to toxic or similar substances would 'present a risk of sufficient likelihood or magnitude—and in which there is a sufficiently broad consensus that exposure of anyone to the substance should be prevented—that' the Amendment's protection would be available even though the effects of exposure might not be manifested for some time.

*Helling,* — U.S. at — – —, 113 S.Ct. at 2481–82, *quoting* Brief for United States.

In *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), the Supreme Court stated that

> denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose.... The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency ...

*Id.* (citations omitted).

### b. *The Plaintiffs' Submissions*

In October of 1992, the plaintiffs submitted

several affidavits of SECC inmates[5] in connection with this case. These affidavits described, among other things, the conditions pertaining to the use of the chemical toilets and what the affiants claim are the effects on their health resulting from the use of the chemical toilets. In February of 1993, the plaintiffs submitted a set of affidavits of inmates in support of their motion for class certification. In March of 1994, the plaintiffs submitted additional affidavits of inmates in connection with their motion for summary judgment. The affidavits submitted in February 1993 and March 1994 again addressed conditions at SECC, including those surrounding the use of the chemical toilets. Copies of all of the affidavits were served on the defendants.

The plaintiffs have also submitted additional materials regarding the use of the chemi-

cal toilets and the effects of that use on the inmates' health.

### (i) Inmate affidavits

Many inmates swore that they have suffered rashes, burning and other skin irritation after having come into contact with the chemical solvent used in connection with the chemical toilets.[6] Some inmates stated that these dermatological reactions occurred on their buttocks after using the toilets.[7] Others averred that allergic reactions occurred on their arms after they emptied the chemical waste receptacles into the slop sinks.[8] Still others stated that the skin on the groin has become irritated.[9]

Several inmates said that the stench from the chemical toilets caused headaches and nausea.[10] Some specifically stated that this reaction to the smell occurred when they

---

5. The affidavits are quoted extensively throughout this opinion. They sometimes contain grammatical and other errors which the court, in order to avoid undue distraction, has not noted with the customary "[sic]".

6. Affidavit of Richard Fleurant, July 14, 1992 ("My skin has also further broken out"); Affidavit of Barry Constant, October 20, 1992 (skin has broken out with sores); Affidavit of Glen Turczyn, October 5, 1992 (toilet caused him to break out with acne); Affidavit of Paul Papas, October 5, 1992 ("The exposure to the water and/or chemical has created unknown and previously unseen bumps on my skin and created digestion problems theretofore unknown"); Affidavit of James Daniels, October 1, 1992 ("I have ... developed two cysts which for some reason, I have been unable to have treated or removed."); Affidavit of Joseph Fegan, October 4, 1992 ("Since I have come to S.E.C.C. Bridgewater I have developed a skin rash on my back and I am losing my hair very rapidly"); Affidavit of Bruce Fournier, October 4, 1992 ("I am suffering with a persistent skin rash that appeared approx. 7 months ago"); Affidavit of Vincent Delgado, November 1, 1993 ("I have to do this task (empty my portable toilet) daily and quite often get splashed, dripped upon, by others contents from their portable toilets ... [M]y wrists and hands swelled up, and was burning/itching which caused me to go to the H.S.U. at 9:00 a.m. on October 30, 1993 ...").

7. Affidavit of Paul Papas ("When in use the chemical splashes up into the body cavities and causes a burning sensation"); Affidavit of Neil Anderson, October 1, 1992 ("When I use my Pak-a-Potti and I am sitting on it and it splashes on my body it burns ..."); Affidavit of John Resendes, October 3, 1992 ("During the use of my

pak-a-potti I have notice the growth of lumps, boils ... on my lower buttocks").

8. Affidavit of Anthony Rose, October 25, 1992 ("On several occasion, I've been splashed with this chemical while washing my 'potti', and have broken out into rash, and have had eye irritant to me"); Affidavit of James Roberts, January 26, 1993 (In January of 1992, "I started to break out in a very serious rash, swelling, discoloration of the entire body." After going to the health unit and using creams to no avail, "[u]pon my own, I had stopped utilizing the chemicals in the Chemical Toilets, and the swelling rash stopped"); Affidavit of Matthew Brady, October 3, 1992 ("Quite frequently when I use this toilet the chemical splashes up and gets on my testicles and rectum. I have hemorrhoids and sometimes they are bleeding. This causes a burning sensation."); Affidavit of Anthony Smith, October 7, 1992 ("I personally have received 'rashes' from the chemical being splash on me, in cleaning the 'potti', and it causes burning sensation"); Affidavit of Rafael Buria, November 7, 1992 ("When in use the chemical splashes up onto the body and causes burning on the skin and irrit. the nose, lung").

9. Affidavit of Alfredo Stevens, November 15, 1992 ("I have spots inside my groin area that I did not have before I moved in to one of those cells"); Affidavit of Arthur Vieira, October 5, 1992 ("Since I have been here I have had hair loss and some type of growth of lump in my upper legs, things that I did not have prior to my incarceration").

10. Affidavit of James Oliver, January 31, 1993 ("since being confined in these cells ... I have been having severe headaches"); Affidavit of Ed-

queued up to empty the toilets into the slop sinks, as well as during the emptying process itself.[11] Others stated that the stench, with its accompanying adverse effects on health, pervaded their cells, especially during the warmer months.[12] Some inmates stated that they vomited as a result of the odors.[13]

Some inmates said that the fumes from the chemical toilets have caused eye irritations, shortness of breath and sneezing.[14]

### (ii) Chemical Solvent in the Toilets

The chemical toilets use a "holding tank deodorant" manufactured by SeaLand Technology, Inc. The plaintiffs have submitted several of the labels that accompany the deodorant. A packet used with the chemical toilets contains the following warnings: "CAUTION: Do not take internally. Contains paraformaldehyde. Avoid contact with eyes, skin and mucous membranes. Avoid breathing dust or vapor. Prolonged or repeated contact may cause allergic irritation." A quart container provides the following warnings: "DANGER [graphic of skull and cross-bones] POISON. May be fatal or cause blindness if swallowed. A strong sensitizer—causes severe burns. Vapor harm-

ward Enos, October 3, 1992 ("Since being placed in a cell without any plumbing of any kind, I have experienced constant headaches, weakness and bloody noses"); Affidavit of Wilfred Dupras, October 2, 1992 ("bad head aches"); Affidavit of John Crosta, October 5, 1992 ("While I have been assigned to my cell, I have suffered from constant headaches and burning eyes. This Pak-A-Potty is located next to my bunk and is constantly emitting irritating fumes."); Affidavit of Robert Addonizio, October 30, 1992 ("If I don't empty it everyday the smell of the excrement and the chemicals is too much for me to take. The smell gives me headaches as it is. Those headaches get worst in the summer with the heat, as does the smell, it seems to stick to the brick walls."); Affidavit of Frank Odierno, October 30, 1992 ("I have had numerous headaches and stomach aches since I have been required to sleep in the closed area with the Pak-A-Potti and the chemical used inside. My eyes water a lot also."); Affidavit of Dan Cranshaw, October 30, 1992 ("Since my stay here I had acute headaches and very painful I might add." Headaches stopped after ceasing to use chemicals in toilet.)

11. Affidavit of James Oliver, January 31, 1993 ("I get extremely nauseous every time I empty [my toilet]."); Affidavit of John Manning, November 16, 1992 ("The smell is unbearable at times and I have on several occasions become ill after cleaning."); Neil Anderson, October 1, 1992 ("The smell of the human waste and chemicals that put in our pak-a-potti, the smell in the morning makes me sick!"); Affidavit of John Resendes, October 3, 1992 (In the slop sink room, "there are other inmates washing and brushing their teeth during this process. Some inmates end up getting sick from the smell and sight"); Affidavit of John Crosta, October 5, 1992 ("There is a horribly foul odor emitted from this procedure that is unbearable. I always attempt to hold my breath during this procedure so I won't pass out from exposure to the fumes as they always leave me dizzy and nauseous.")

12. Affidavit of Richard Fleurant, July 14, 1992 ("The odors from this toilet have caused me nausea and loss of appetite."); Affidavit of Den-

nis Costa, October 3, 1992 ("At times I get so sick from the smell I can't even eat"). See also n. 19.

13. Affidavit of Marc Letourneau, December 23, 1992 ("As a result of being placed under these conditions, I repeatedly became sick and was vomiting profusely"); Affidavit of John Chasse, October 1, 1992 ("The smell is enough to make any man vomit, and does."); Affidavit of Anthony Johnson, 1992 ("you can smell human waste so bad it would make you throw up"); Affidavit of Henny Moligmana, October 4, 1992 ("because of my asthma [I] choke and sometimes vomit"); Affidavit of Joseph DiBlasio, October 4, 1992 ("when one is emptying their pak-a-potti the odor is very disgusting and on numerous occasions I almost vomited and I had to leave the slop sink area to catch my breath and other inmates have to do the same"); Affidavit of Khalil Al-Jammi, October 6, 1992 ("There have been times when I have been awakened out of a dead sleep at 5:00 a.m. causing me to vomit because of the stench being so bad that I could actually taste it, causing man to choke and vomit."); Affidavit of Robert Munroe, October 31, 1992 ("I have had skin irritation, burning and watering eyes, sinus irritation and have even vomited on two occasions.")

14. Affidavit of Anthony Rose, October 25, 1992 (eye irritation); Affidavit of Barry Constant, October 20, 1992 (infections in eye); Affidavit of Santiago Rivera, February 3, 1992 ("Each night, when the Pak-A-Potti is in my cell, my eyes and nose hurt from the fumes of the chemicals"); Affidavit of Malcolm Hicks, November 24, 1991 ("My eyes run and burn all the time in my cell, my nose runs, my eyes have gotten very bad."); Affidavit of Kenneth Medeiros, October 1, 1992 (the chemical produces "an eye irritant to me, in the form of a burning sensation and slight redness to the eye, especially after the potti tank has some human waste introduced into it."); Affidavit of Khalil Al-Jammi, October 6, 1992 ("It has caused me shortness of breath, sneezing and has given my eyes a burning sensation.")

ful." An instruction on the back of the quart container states: "Contains Methyl Alcohol and Formaldehyde. Cannot be made non-poisonous. Avoid contact with skin, eyes or mucous membranes. Avoid prolonged or repeated breathing of vapor. Prolonged or repeated contact may cause allergic irritation."

The plaintiffs also submit a "Material Safety Data Sheet," apparently prepared by Sea-Land Technology, Inc., which states, among other things, that paraformaldehyde contains 55–65% "hazardous components." The data sheet also lists as acute health hazards "irritant to respiratory system and eyes, dermatitis, conjunctivitis;" as a chronic health hazard "corneal burn;" as signs and symptoms of exposure "tearing of eyes, irritation of nose and lungs;" and as medical conditions generally aggravated by exposure "respiratory conditions such as asthma." The First Aid procedure to be used in response to "inhalation" is to "[r]emove person to fresh air. Administer oxygen if necessary." [15]

### (iii) *Grelotti Letter*

The plaintiffs also present a January, 1993 letter written by the defendant, Richard Grelotti, Assistant Deputy Commissioner of the Department of Correction, to David Fierra, Director of the Water Management Division of the U.S. Environmental Protection Agency ("E.P.A."). The letter responds to a November E.P.A. Administrative Order regarding water pollution. Speaking of toxic substances in the water, Grelotti wrote: "A number of possible reasons for this have been explored up to this time, and a possible culprit is the substance used in the disinfec-

tion of the approximately 400 chemical toilets on the Complex. *This substance contains paraformaldehyde, which is very toxic to many forms of life,* and it is suspected that the volume which is dumped down the drain every day is more than adequate to contribute to the observed toxicity." (Emphasis added.)

### (iv) *Massachusetts Regulations*

The plaintiffs also note that 105 C.M.R. 650.015–650.017 lists formaldehyde [16] as a toxic substance, an irritant, and a hazardous substance.

In addition, 105 C.M.R. 451.113 provides: "Each cell within which an individual may be locked for any part of a 24–hour day shall have a working toilet and working handwashing sink with hot and cold running water. Each toilet bowl shall be raised off the floor of the inmate's cell and shall be capable of being flushed from the interior of the cell."

### (v) *Walker Report*

The plaintiffs have submitted a "Report of Conditions of Confinement in The Southeastern Correctional Center," by Bailus Walker, Jr.,[17] based on an inspection of SECC which he conducted on December 3 and 4, 1982, with then-counsel for the plaintiffs, Mark Borreliz.[18]

The report notes that many communicable diseases may be passed from inmate to inmate in excrement, by way of water, food or clothing. It states that the process of emptying the chemical toilets into the slop sink creates air-borne droplets which harbor bac-

---

**15.** The defendants have not objected to the court's consideration of this evidence in connection with the present motion. Nor have they denied that some of the chemicals used in the toilets are toxic in the manner described in the data sheet. Indeed, as the reader will presently see, at least one of the defendants acknowledges that toxic substances are used in the chemical toilets. The court thus considers it undisputed that the chemicals in the toilets contain components hazardous to health.

**16.** The record does not show whether formaldehyde and paraformaldehyde are the same chemical or whether, if they are different, that difference extends to the manner in which each is

toxic. The plaintiffs refer to paraformaldehyde and formaldehyde interchangeably, and the defendants do not challenge the interchangeable references.

**17.** As of the time of the preparation of the report, Walker was an environmental health scientist, with a Masters in Public Health and a Ph.D. in a field unspecified in the record.

**18.** While the report is now several years old and, in its present form, is vulnerable to evidentiary objections, no objections to its use in connection with the present motion have been interposed by the defendants; nor do the defendants challenge the report's conclusions.

teria and viruses. It also states that fecal bacteria may produce infection via the respiratory tract or by being deposited in the nose or throat and then swallowed.

#### (vi) *Stench*

Several inmates have testified that an overpowering stench of human feces, urine and chemical solvent fills the slop sink area, where the inmates must wait in line to pour their waste into the slop sinks.[19] Other inmates have stated that the sickening odor of human waste suffuses their cells.[20]

**19.** Affidavit of Anthony Rose, October 25, 1992 ("And I must stand in line, to use the one slop sink at the end of the corridor, to dump my 'potti' and endure the filthy, disgust smell of human waste, with water used, all on the floor, while I dumping my 'potti'."); Affidavit of John Chasse, October 1, 1992 ("There is a small fan in the window for the purpose of creating a vacuum in which to suck the fumes out of the slop sink room. Which in fact, has little to no effect. And please also make note that we must breath this fume, chemical vapor, and air borne particles in, until this filthy job is done."); Affidavit of Neil Anderson, October 1, 1992 ("the smell is real bad"); Affidavit of Ronald Ragusa, October 4, 1992 ("when it is time to empty the potti you have to stand in a line of 10–12 inmates that are emptying their potti in a sink in a room with no ventilation"); Affidavit of Anthony Smith, October 7, 1992 ("the area, slop sink where we dumped are filthy, almost unbearable to smell and we must inhale this odor in disposal of our human waste.")

**20.** Affidavit of Anthony Rose, October 25, 1992 ("And also, if you don't empty your 'potti', and choose to go to breakfast, you have wait to the next day and endure that smell, filth all night long."); Affidavit of Michael White, October 23, 1992 ("I have to smell the chemical and my stored human excrement"); Affidavit of Paul Papas, October 5, 1992 ("The odor permeates the enclosed area and lingers for a substantial period of time."); Affidavit of Kenneth Medeiros, October 1, 1992 ("I sleep in the room with the smell of it. This can . . . make you very sick at times"); Affidavit of Dennis Costa, October 3, 1992 ("Having the pak-a-pottis in the cell all day long gives off a foul odor whether full or empty."); Affidavit of Edward Souza, October 4, 1992 ("There is a pak a potti in my cell and it smells so bad that at times I have to sit by my window to breathe fresh air. The chemicals that are put in the pack a potti have a foul odor to it.") Affidavit of Arthur Vieira, October 5, 1992 ("There is no ventilation in the rooms you have to smell human waste all day . . ."); Affidavit of John Resendes, October 3, 1992 (He states that he had a broken chemical toilet, "So now I must urinate and remove solid

#### (vii) *Slop Sinks, Tooth Brushes, Face-Washing and Human Waste*

Several inmates testified that the slop sink area is relatively small. Frequently, according to these inmates, as many as twenty-five to thirty-five other inmates wait in line to empty the chemical toilets into the slop sinks. Sometimes, when one inmate is dumping his waste, he splashes another nearby inmate who is also dumping his waste.[21] At the same time that inmates are dumping their toilets into the sinks, other inmates are using nearby sinks to wash their faces and brush their teeth.[22] The sinks in which the human

waste in drink bottles to contain the smell and leakage in my room."); Affidavit of Brian Pollitt, October 3, 1992 ("If another inmate uses his pack-a-potti say two or three cells away from you the stench from their use rolls out into the hall and into all the rooms around that one."); Affidavit of Khalil Al–Jammi, October 6, 1992 ("Some people empty their pack-a-potti once a week. The chemicals do nothing for the stench. So on a daily basis you smell human waste either from those that empty their pak-a-potti in the a.m. or by the guys who don't empty theirs but once a week because the odor is so bad it comes right out into the hall from the cell window."); Affidavit of Anthony Smith, October 7, 1992 ("Also, if you wait several days to empty your 'potti', because you have the option to go eat breakfast or empty your 'potti' in a 45 min. or one hour time-span. Your 'potti' gives out a foul odor and will overflow with urine and human waste if you wait several days. And the C/O depending who's working will not let you empty your 'potti' if you miss that morning and you must endure the smell and inhale that disgusted filth, until the next day."); Affidavit of Rafael Buria, November 7, 1992 ("On warmer weather, as in the spring and summer time, . . . the waste materials in the 'Pak-a-Pottie' begins to boil up a putrefying odor after 24 hours.")

**21.** Affidavit of James Oliver, January 31, 1993 ("When emptying the toilets you cannot help getting splashed by urine and feces")

**22.** Inmates Juan Saldarriaga, Llorley Carmona, Walter Victoria, Carlos Cairosgeillo, Antonio Medina, Cesar Scott, Fernando Osorio all signed affidavits, dated October, 1992, which stated, in part:

> This statement is to notify whom ever it may concern on the procedures we must take each and every day to clean our pak-a-pottie. What we have to do each day is, break down and separate the water tank from the holding tank. We then carry the tank with human waste to a sink where there is about 25 to 35 other in-

waste is dumped sometimes back up and spill their contents onto the floor.[23]

Some stated that those inmates confined in "solitary" are only permitted to empty their chemical toilets every other day.[24]

#### c. *The Defendants' Response*

The defendants have submitted affidavits of three persons in response to the plaintiffs' motion for summary judgment. Lisa Mitchell, the Unit Manager for the East Housing Unit, and Sergeant Robert Eklund, the Acting Unit Manager of the Central Housing Unit, both submitted affidavits. Their responsibilities include overseeing the use and maintenance of the chemical toilets, including review of bi-monthly reports regarding the condition of chemical toilets. Those reports are submitted to them by the Housing Sergeant. Superintendent Bissonnette also submitted an affidavit and a supplemental affidavit.

None of the affidavits specifically refutes the description of how the chemical toilets are used and emptied and the effects on the inmates' health from the use and emptying of the toilets. A very close reading of them is necessary therefore to determine whether they raise a genuine issue of material fact regarding the chemical toilets.

#### (i) *Health Problems*

Both Mitchell and Eklund state they have "received complaints from inmates regarding illnesses or irritations allegedly caused by using the chemical toilets and/or from the chemical solution." Each says he or she responds to such complaints: "When I receive such a complaint, I refer the inmate to the Health Services Unit."

Neither Mitchell nor Eklund denies that the inmates experience the health problems described in the inmates' affidavits. Neither Mitchell nor Eklund addresses in detail the health problems about which the inmates have complained, and neither provides facts about what the Health Services Unit has determined as to the cause of the inmates' ailments.

Superintendent Bissonnette states that she is "quite familiar with the problems raised by inmates about the institution and ... institutional staff works on a daily basis to address any number of inmate complaints, including complaints raised by the plaintiffs in this case." She states that she meets at least twice a week with the SECC Health Services Administrators to discuss health care issues relating to SECC. She states that "[a]t no point in any of these meetings have we ever had any indication that any inmates had incurred any asbestos related illness, nor any illness caused by unsafe drinking water, nor

---

mates waiting in line to empty the tank. But while this is all going on other inmates are washing their face and brushing their teeth. This room is very small to do all of these things at once because when one inmate is dumping the waste sometimes splashes on the other inmate which causes a lot of hostilities between each other. The room where we do this at times it has about ¼ INCH OF WATER MIXED WITH HUMAN WASTE. This makes it hard not to do what is required in a certain amount of time. Then when it is time to wash or brush, and you are not there early enough the sinks they expect you to do this in are backing up with human waste. *See also* Affidavit of Raymond Cruz, 1992 ("[D]uring the process of emptying the 'Pak–A–Pottie', I would have to stay in line with the other inmates and smell all the human waste for a period of time also smell the chemical that is used in the Pak–A–Pottie. While process is going on we must wash our face, teeth in the same room."); Affidavit of Arthur Vieira, October 5, 1992 ("While this process is going on we must wash and brush our teeth in the same room.

This room is about 6 feet by 9 feet, which makes it almost impossible to do so with out getting in contact with the chemicals and human waste that is being emptied. Sometimes even the sink that I am using to wash my teeth and face becomes overflooded with the Human waste and chemicals from the other sinks."); Affidavit of Joseph DiBlasio, October 4, 1992 (15 to 30 inmates have to line up to dump the chemical toilets).

**23.** Affidavit of John Manning, November 16, 1992 ("There are many times that these sinks back up and spill over on to the floor leaving human waste on the floor. Also the sink room upstairs does the same allowing leakage down the pipes and on the walls.")

**24.** Affidavit of Robert Carter, October 1, 1992; Affidavit of Rafael Buria, November 7, 1992 (Inmates in B-1 segregation may only dump chemical toilets three times a week, and inmates in isolation status may only dump toilets two times a week.)

any instance of any illness which had been caused by exposure to hazardous substances."

Bissonnette states that she has been "concerned about the implementation of Superior Court Judge Charles Hely's order relating to the chemical toilets and not once in any of the meetings that I have had, have any of the health services staff reported to me that any inmate has suffered specific injuries relating to the use of the chemical toilets. In particular, I have never received a report of any inmate having any illness caused by 'exposure' to hazardous substances."

Bissonnette continues: "Inmates are all quite familiar with the process for accessing health care. An inmate may go on sick call when injured or ill. Any inmate who is ill or who may suffer from an illness which they believe to have been caused by chemicals would simply report the matter to his Unit Administrator and the Unit Administrator would insure that the inmate received prompt medical attention. At no point, since I have been Superintendent, have I been made aware of any specific issues relating to such illnesses."

Superintendent Bissonnette also states the following:

I continued to meet with inmates from Monday to Friday, on either a four or five times per week basis from 12:00 to 1:15 on each day to receive complaints and discuss issues with particular inmates. Any inmate who is housed at SECC has the opportunity to discuss complaints or problems with me outside the inmate dining room during this period of time. I am accessible to inmates to discuss inmate complaints, problems and issues at these times. I also walk the institution on a regular basis and I visit each area of the institution not less than once weekly, in order to ascertain the physical condition of the units as well as to observe how the institution is running.

She also says:

The Department of Public Health inspects SECC at least once annually and has done so for a number of years. DPH will observe deficiencies and note them in a report to me and to other Superintendents before me. It is the routine practice of DPH and the Administrative staff at SECC to take deficiency check lists and to respond to problems identified by DPH to correct problems that are correctable and to address areas of concern. We attempt to respond to each DPH visit by attempting to address any deficiencies noted and to respond to DPH as to what corrective action is taken. On any deficiency that they note, we attempt to take immediate and prompt corrective action.

As with any institution, which involuntarily houses twelve hundred inmates, maintaining SECC as a clean, safe secure institution, constitutes a major effort on the part of management, staff and inmates.

### (ii) *Stench*

The two unit managers state that the chemical toilets are inspected twice each month. They say that toilets which are damaged or are not working properly are repaired or replaced.

The unit managers state that some inmates have used their toilets as stepping stools, or for placement of hot pots for cooking, practices which caused the lids of the toilets to crack. They say that when cracking or other damage to a toilet occurs as a result of inmate misuse, the toilet is replaced, and the inmate is given a disciplinary report.

The unit managers also state that new toilets and replacement parts for the toilets are kept in storage at SECC. "This ensures that inmates have toilets which are in good working order."

The defendants do not directly refute the inmates' claims that their cells are permeated with the smell of human waste.

### (iii) *The Slop Sinks*

Mitchell states that she has "received some complaints from inmates regarding the recent lack of hot water at three slop sinks. I have received no other complaints from inmates regarding the slop sinks." Mitchell's statement is not a denial that the stench, long lines, splashing waste and solvent, and other conditions of the slop sink area exist.

Eklund states that he has "received complaints from inmates regarding the slop sinks when drains backed up as a result of caps and/or things such as brillo pads are dropped into the drain. When I receive such complaints, someone from the maintenance staff is immediately called to correct the problem."

Both Mitchell and Eklund state that there is an exhaust fan in the area of each slop sink. They state that at each slop sink there are three toilet brushes and three spray bottles of liquid detergent, which may be used by the inmates to clean their toilets after emptying them. The two unit managers state that they have not received any complaints about the unavailability of brushes or detergent.

d. *Conclusions as to Chemical Toilets*

(i) *Objective Test*

The court concludes that the defendants have not presented evidence which raises a genuine issue of material fact as to the existence of the conditions or health effects described in the inmates' affidavits.

The defendants do not deny that the chemical toilets create unsanitary and unhealthful conditions for inmates at SECC. At most, Superintendent Bissonnette tries to cast doubt on the inmates' credibility by implying (but not stating directly, or arguing in the brief submitted by her and the other defendants) that if the inmates' statements were true, she would have heard about these health and sanitation problems herself. But such a vague refutation of the inmates' credibility (if that is what it is meant to be), without more, is simply insufficient to get the defendants past summary judgment. *Cf. Fa-*

*vorito v. Pannell,* 27 F.3d 716, 721 (1st Cir. 1994). Moreover, the two unit managers stated specifically in their affidavits that inmates had complained to them about illnesses caused by the chemical toilets. And Bissonnette herself said that she was aware of the problems raised by the inmates at SECC concerning the institution.

The defendants make no effort to refute the inmates' detailed descriptions of the toilet emptying process at the slop sink area, make no effort to raise an issue as to the unsanitary conditions which pervade the slop sink area and many of the inmates' cells, and make no effort to raise an issue as to the many assertions of rashes, headaches, vomiting and other ill effects of the inmates' contact with the chemicals and human waste in the toilets. The plaintiffs have produced evidence that the use of paraformaldehyde-containing chemicals with the toilets causes varying kinds and degrees of health problems. The defendants have offered no contrary evidence. Indeed, as noted above, defendant Grelotti has admitted that the solvents' active agent is "toxic to many forms of life." In addition, the defendants have not disputed the plaintiffs' claim of health problems resulting from their having contact with fecal matter in the chemical toilets, both while in their cells and during the emptying process.

In arguing in their brief that there are material facts in dispute, the defendants omit any mention of the plaintiffs' claims regarding sanitary conditions. At most, they argue that there is a genuine issue as to whether the defendants acted with deliberate indifference to the inmates' injuries.[25]

**25.** The defendants' *entire* argument concerning all the conditions claimed by the plaintiffs to exist at SECC, including the toilets, is set forth in the defendants' opposition to the present motion as follows:

Even assuming that plaintiffs' action is not barred by the doctrine of res judicata, summary judgment is not appropriate when, as here, there are genuine issues of material fact. The Affidavit of Superintendent Lynn Bissonnette clearly establishes that there are genuine issues of material fact ... For example, plaintiffs claim that they are exposed to asbestos while, Superintendent Bissonnette states that there is no damaged asbestos pipe insulation in

areas where inmates have access.... Plaintiffs claim that the water is unsafe. The Superintendent states that water is tested monthly and that she has never been informed that the water is unhealthy and/or unsafe to drink.... Plaintiffs claim that defendants have been deliberately indifferent to injuries suffered by inmates as a result of asbestos, water and hazardous substances. Superintendent Bissonnette states that she regularly meets with SECC's Health Services Unit Administrator and with inmates and that she has received no reports of inmates having illnesses caused by either asbestos, the ingestion of water, or hazardous substances ... Clearly, these issues of fact need to be resolved before a legal determi-

The court concludes that summary judgment in favor of the plaintiffs is appropriate as to the objective aspect of their Eighth Amendment claim regarding the use of the chemical toilets. Both because of the health problems caused by use of the toilets, and because of the grossly unsanitary conditions that accompany that use, the court concludes that the use of the chemical toilets falls well below contemporary standards of decency. As to the question of health, if the future harm resulting from exposure to second-hand smoke can give rise to an Eighth Amendment violation, then surely daily contact with a hazardous substance which causes rashes, burning, tearing eyes and headaches meets the objective part of the test for a violation of the Eighth Amendment. *See Helling v. McKinney*, —— U.S. ——, —— – ——, 113 S.Ct. 2475, 2480–81, 125 L.Ed.2d 22 (1993). And the unsanitary conditions that attend the use of the toilets in the cells and the emptying of them in the slop sink area call to mind the muck that "boils up and pours over" in the gloomy second river of hell, the Styx, described by Dante.[26]

The fact that a person has committed a crime and has been sentenced to a penal institution does not give the state a license to treat that person like a beast. The manner in which the inmates at SECC must dispose of their bodily waste results in a condition of confinement more bestial than human; or to put it in constitutional terms, the use of the chemical toilets at SECC is "indecent" and "uncivilized." *Rhodes v. Chapman*, 452 U.S. 337, 346, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981).[27] The court therefore grants summary judgment to the plaintiffs with respect to the "objective" prong of the Eighth Amendment test.

### (ii) *Subjective Test*

The court concludes, after careful consideration, that there are genuine issues of material fact as to the defendants' deliberate indifference with respect to the problems associated with the chemical toilets.

To repeat the First Circuit's "deliberate indifference test," "a plaintiff must demonstrate 'deliberate indifference' by showing (1) an unusually serious risk of harm . . . (2) defendant's actual knowledge of (or, at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk." *Manarite v. City of Springfield*, 957 F.2d 953, 956 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 113, 121 L.Ed.2d 70 (1992).

By satisfying the objective aspect of the Eighth Amendment test, and particularly by showing that they are daily subjected to serious health hazards through use of the chemical toilets, the plaintiffs have demonstrated a serious risk of harm. While it is a close question, the court concludes that there are triable issues concerning whether the defendants were aware of that harm and whether they were deliberately indifferent to it.

Bissonnette states that she has never heard of any inmate complaints regarding exposure to hazardous materials, like the chemical used in the toilets. She states that she is available to meet with inmates, and that she regularly walks around SECC. One of the possible inferences from that statement is that Bissonnette is not aware of the unsanitary conditions associated with the use of the chemical toilets. In addition, one might argue that the state court decision in *Langton v. Fair* itself gave the defendants reason to believe that they were not engaging in any improper behavior by using the chemical toilets.[28]

nation can be made as to whether or not the conditions at SECC constitute cruel and unusual punishment.
Defendants' Opposition at 12–13 (citations omitted).

**26.** Dante Alighieri, *The Divine Comedy: Inferno*, Canto VII (Oxford University Press, 1961).

**27.** The court's conclusion, while different from that of the court in *Langton v. Fair*, is based on a different record. The court in *Langton* conclud-

ed that, at SECC, unsanitary conditions were not present. This court, based on the undisputed facts before it, concludes that the conditions at SECC are grossly unsanitary, and constitute a violation of the Eighth Amendment, at least as to the objective prong of the inquiry.

**28.** On the other hand, Mitchell and Eklund, who are under the supervision of Bissonnette, have stated in their affidavits that they have "received complaints from inmates regarding illnesses or irritations allegedly caused by using the chemical

On a motion for summary judgment, all inferences must be indulged in favor of the non-moving parties, the defendants in this case. *See In re Varrasso*, 37 F.3d 760, 763 (1st Cir.1994); *Morris v. Government Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994). While a court is not required to deny summary judgment when state of mind is at issue, *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990), a court should exercise caution and restraint when faced with a state of mind question. *See Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 109 (1st Cir.1988). Accordingly, the court concludes that a trial is necessary on the question of deliberate indifference with respect to the chemical toilets.

### 2. *Fire Safety*

#### a. *Law*

The First Circuit has stated:

There is no question that fire safety is a legitimate concern under the Eighth Amendment.... Persons involuntarily confined have a constitutional right to safe conditions of confinement.... The state has a duty to ensure that safety, because the individuals concerned, by reason of the confinement, cannot provide for their own safety.... We are also aware, however, that not every deviation from ideally safe conditions constitutes a violation of the constitution....

*Santana v. Collazo*, 714 F.2d 1172, 1183 (1st Cir.1983).

In *Dimarzo v. Cahill*, 575 F.2d 15 (1st Cir.1978), *cert. denied*, 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978), the First Circuit affirmed an order of the district court mandating certain changes in the Essex County House of Corrections, noting that the district court had "found the most pressing problem to be the fire hazard." Among other problems, the institution in Dimarzo, like parts of the one here, was a 19th century structure with cells that had to be unlocked manually.

The First Circuit stated that there can be no

serious dispute that plaintiff inmates have a personal stake in the fireworthiness of the structure in which they are housed. Defendant Hall inaptly construes the requirement of injury as requiring proof that the inmates inevitably will suffer physical injury or death from fire before they have standing to challenge the hazardous fire conditions which the district court found existing at Essex. We find this proposition far below contemporary expectations of constitutionally-mandated humane treatment. One need not wait for the conflagration before concluding that a real and present threat exists.

*Id.* at 18. *See also Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir.1985) ("Prisoners have the right not to be subjected to the unreasonable threat of injury or death by fire and need not wait until actual casualties occur in order to obtain relief from such conditions.")

#### b. *The Plaintiffs' Position*

The plaintiffs, in addition to relying on the undisputed lack of a sprinkler system and the manual locks on the cell doors, point to the Massachusetts fire regulations, which provide, in part: "Each facility should have a system whereby correctional officers on duty are able to unlock all doors promptly to allow rapid exit of inmates in the event of fire or other emergency." 105 C.M.R. 451.381. The regulations also provide:

(A) The superintendent ... of each facility should consult with the State Fire Marshal ... and with the local fire department, and plan a fire protection and detection system adequate to protect inmates from unreasonable risks of smoke and fire. In his planning, the superintendent ... should take cognizance of such matters as staff training and removal of hazardous substances, and the feasibility of such devices as smoke detectors, automatic unlocking systems, automatic closure of internal ventilation systems to prevent the spread of

toilets and/or from the chemical solution." It seems odd that Bissonnette would not be aware of these complaints when her subordinates are. In any event, the Mitchell and Eklund affidavits

raise again the question of institutional deliberate indifference to which this court adverted in its earlier opinion in this case. *Masonoff v. DuBois*, 853 F.Supp. 26, 29 n. 1 (D.Mass.1994).

smoke, and to remove smoke from occupied areas, and sprinkler systems. . . . (B) Each facility shall comply with applicable State Building Code provisions on fire safety.

Section 1002.8 of the Massachusetts Building Code provides, among other things, that institutions like SECC must have "a sprinkler system which may be manual or automatic in operation."

The plaintiffs also note that the doors to the cells are made of wood and have been painted over several times.[29] The cell floors are also made of wood.[30]

#### c. The Defendants' Position

Superintendent Bissonnette states that

[w]e have implemented at SECC rigorous safety procedures which include evacuation drills, fire drills and routine inspections of fire safety equipment. Consistent with Judge Hely's Findings of Fact [in *Langton v. Fair* ], since I became Superintendent in 1993, there have been no reported instances of any injury to any inmate as a consequence of any fire related accident at SECC.

Bissonnette does not describe the fire safety equipment to which she refers.

#### d. Conclusions as to Fire Safety

 The court concludes that there is a triable issue concerning whether the objective test of the Eighth Amendment has been met with regard to the plaintiffs' fire hazard claim.

It is undisputed that SECC lacks automatic locks on the cell doors and that SECC lacks a functioning sprinkler system. The state building code applicable to SECC requires a sprinkler system and encourages the use of automatic door locks.

 A court may look to state codes with respect to prison hazards in its effort to determine society's standard of decency, but these standards do not necessarily reflect the constitutional minimum. *See Gonyer v. McDonald,* 874 F.Supp. 464, 466 (D.Mass.1995).

Superintendent Bissonnette has stated that SECC has implemented rigorous fire safety procedures, including evacuation drills, fire drills and inspections of fire safety equipment. It may be that the safety procedures she has implemented mitigate any danger caused by the lack of a sprinkler system and the lack of automatic locks to such an extent that the constitutional minimum has been satisfied. For this reason, the court is persuaded that a trial on both the objective and subjective aspects of the fire safety question is warranted.

### 3. Water

#### a. The Plaintiffs' Position

Several inmates have stated that the drinking water at SECC is rusty and has a disagreeable taste and smell.[31] As noted

---

**29.** Affidavit of Kenneth Medeiros, October 1, 1992.

**30.** Affidavit of Rudy Gonzalez, October 3, 1992.

**31.** See Gaudreau affidavit, October, 1992 ("they give you a 2 liter pitcher to fill with water or ice that comes out of a pipe line that is rusty"); Michael White Affidavit, October 23, 1992 ("The 'Honor Unit' still has rusty, dirty water for showering, drinking and cooking." The water is "rusty and smells like rotten eggs"); Willie Rivers Affidavit, October 21, 1992 ("It is a fact that the water here is rusty . . . After showering there's rust all over my body"); Affidavit of John Maloney, September 14, 1992 (The water supply "is often shut off for 2 or 3 days at a time, it comes out brown in color, and it has caused me to break out with acne and it has an unforgiving odor."); Affidavit of Lorenzo Scott, November 27, 1992 ("the water is rusty daily, and one must shower and wash clothes with it"); Affidavit of James Oliver, January 31, 1993 ("no matter how

long I let the water run, I cant not remove the rust from the water"); Thomas Benoit, October 2, 1992 ("At times when one is able to use a sink for washing the water runs rusty and malodorous for a length of time before it becomes usable"); Affidavit of John Chasse, October 1, 1992 ("Sir, when I wipe my water pitcher out every night, before putting fresh water and ice in it, you can see on the toilet paper I use, a solid reddish color which comes from the water!"); Affidavit of James Daniels, October 1, 1992 ("I worry about my health every single day, due to my living conditions at S.E.C.C. not only from the chemicals but also from the drinking and bathing water because the water here is always a lite yellow to a dark brown color, and a lot of times has an odor to it."); Affidavit of Joseph Fegan, October 4, 1992 ("The water is always a brown color and has a bad odor and a bad taste to it."); Neil Anderson, October 1, 1992 ("The water here is brown from rust and that's the same water we have to drink and shower with and this is the same water they cook our meals with."); Affida-

above, it is undisputed that there is no running water in the cells, and the inmates' drinking water in their cells comes from a pitcher of water.

### b. *The Defendants' Position*

Superintendent Bissonnette states that the water is tested at Bridgewater at least once a month. She says that she has never seen a test

> which has indicated that the water at SECC was unhealthy and/or unsafe to drink. I am familiar with Justice Hely's findings which included detailed Findings of Fact that the water was neither unhealthy or unsafe to drink. There is no reported instance of which I have been aware, either before I became Superintendent, nor subsequent to my becoming Superintendent, in which there was any documented reports by medical staff of illnesses caused by ingestion of water at SECC.

### c. *Conclusion*

The court concludes that there is a triable issue as to whether the inmates' drinking water is unsafe to drink. The defendants have not offered any evidence to show that the water is not discolored or that it does not have an unpleasant odor or taste. But Bissonnette's affidavit, in discussing the

favorable tests on the water, does raise a question as to whether the water is fit for human consumption. Accordingly, summary judgment will be denied on this issue.

### 4. *Asbestos Contamination*

#### a. *Law*

A "prisoner may bring an Eighth Amendment claim that environmental hazards in a prison, such as exposed asbestos, pose an unreasonable risk of serious damage to future health." *Gonyer v. McDonald*, 874 F.Supp. 464, 466 (D.Mass.1995). In a case in which asbestos contamination is claimed, the plaintiffs must "show a deliberate indifference to a risk of serious damage to their future health, specifically exposure to an unreasonable level of asbestos." *Id.* "Plaintiffs' assertion that exposure to asbestos fibers causes cancer states a cognizable Eighth Amendment harm." *Id.*

#### b. *The Plaintiffs' Position*

Several inmates have stated that they have observed asbestos hanging off old pipes, flaking off into the air that the inmates breathe, and landing at times in the inmates' drinking water, and at other times on the inmates' clothes.[32]

---

vit of William Cannatin, October 2, 1992 ("The water in this place is always a rust color, it's bad enough trying to clean myself with it, but I also have to drink it"); Affidavit of Bruce Fournier, October 4, 1992 ("The water tastes bad and is discolored and rusty"); Affidavit of Joseph Di-Blasio, October 4, 1992 (The water "has a golden red rust color to it"); Affidavit of Michael Vernaglia, October 5, 1992 ("The water in here is brown, almost black sometimes"); Affidavit of James Doane, October 5, 1992 ("What water is available at S.E.C.C., has an enormous amount of rust and other deposits in it.")

**32.** For example, inmate Barry Constant states that on April 9, 1993, he observed "a bracket that broke loose from the ceiling that holds a heating pipe within the slop sink room. The pipe was hanging an inch, or two, and particles of what appeared to be Asbestos on the Floor and Windowsill on the open window within the slop sink room." James Cox states that in 1992, he was required to pick up and sweep up asbestos from the floor near his cell. Affidavit of James Cox, February 10, 1993. Richard Wyche states: "Since I've lived up in this section, there has been a heating line that covers the length of the tier with asbestos covering with numerous cracks

in the covering. There's approximately 19 cells on this tier, and the covering travels the length of it. On the far end of the tier there was a large break in the covering which they did repair but not until we were exposed to this harmful agent for at least two weeks! But there has been no attempt to remove the rest of the ruptured areas." Affidavit of Richard Wyche, November 19, 1992. Affidavit of Michael Coulter, November 30, 1992 ("Since I have been celled in unit number F–⅛, the Asbestos that is around my cell area is ample; and there have been many water leaks from covered pipes, and much of the insulation covering of said asbestos is gone ... As a result of the uncovered asbestos in and around my cell area, there is powder like material floating in the air and I cannot help but to breath this material ... Many times after sweeping out my cell, I have found a lot of the dust that resembles the material that was covering the pipes ...") Affidavit of John Chasse, October 1, 1992 ("There is asbestos which they tell workers (inmates) they have to take it down off the pipes which are exposed. Not giving them equipment in which to handle it or nothing."); Affidavit of Tiago Sousa, October 3, 1992 ("most of the pipes are so old that they are insulated with asbestos

### c. The Defendants' Position

Superintendent Bissonnette states:

Asbestos was used as insulation on the steam heating pipes at SECC. Asbestos is regularly removed and/or repaired in accordance with procedures developed by SECC's Director of Engineering and the Massachusetts Division of Capital Planning and Operations. The Director of Engineering informs me that, to his knowledge, there are no areas at SECC which present a health risk to inmates or staff and that there is no damaged asbestos pipe insulation in areas where inmates have access.... I meet with SECC's Health Services Unit Administrator twice each week and I conduct a 'happy hour' four times each week at which time I make myself available to the inmates outside the inmate dining room so that the inmates can talk to me about their problems and/or concerns.... I have never received a report of any inmate having or complaining about an asbestos related illness.

### d. Conclusions as to Asbestos

■ Based on the Superintendent's affidavit, the court concludes that there is a triable dispute as to whether there is exposed asbestos at SECC that endangers the health of inmates.

and there is rips and cracks in them so we are breathing the fibrous minerals"); Affidavit of Bruce Fournier, October 4, 1992 ("There is exposed asbestos in Dorms 8 and 9. I was for a time employed as an Asbestos Abatement Technician (Several Years Ago) and can assure you that the condition of the pipe insulation is highly dangerous to anyone who must live or work here.")

**33.** Affidavit of Marc Letourneau, December 23, 1992 ("I witnessed several mice running freely on the floor of the Bakery unit."); Affidavit of William Murray, October 20, 1992 ("there are numerous rats (mice) that run around, and they refuse to set traps."); Affidavit of John Chasse, October 1, 1992 ("And on top of all this filth and neglect, I have to try to sleep at night with cockroaches crawling everywhere."); Affidavit of Joseph Fegan, October 4, 1992 (Dorm 8 & 9 are infested with mice ..."); Affidavit of Neil Anderson, October 1, 1992 (witnessed rats and roaches in the SECC kitchen, where he worked); Affidavit of Ronald Ragusa, October 4, 1992 (rats running around in the shower, rats living in the drains); Affidavit of Anthony M. Johnson, 1992 ("roaches all over the place", "rats would run

### 5. Vermin Infestation

The plaintiffs have adverted in their affidavits to a vermin infestation problem which allegedly exists at SECC. While this condition is not specifically alleged in the complaint, it is connected closely enough with the other issues in this case to warrant consideration here. The plaintiffs will be permitted to amend their complaint to add allegations concerning this condition, and the defendants will have an opportunity to contest these allegations at trial.

### a. Law

■ "Active infestation of vermin such as rats, mice, birds, and cockroaches is inconsistent with the adequate sanitation required by the Eighth Amendment." *Toussaint v. McCarthy*, 597 F.Supp. 1388, 1411 (N.D.Cal. 1984). "[I]mprisoning plaintiffs in dungeon-like conditions in which rodents crawl all over and attack them is barbarous to the standards of our contemporary society." *Walton v. Fairman*, 836 F.Supp. 511, 515 (N.D.Ill.1993).

### b. Inmates' Affidavits

The inmates' affidavits tell of mice and rats that roam freely in the halls and cells of SECC, and of cockroach infestation.[33] One

out of the drains when you are taking showers"); Affidavit of Matthew Brady, October 3, 1992 ("I've seen several rats in the hallway and the showers."); Affidavit of Edward Souzah ("on one very hot August night when I was sleeping in my boxing trunks, I was awaken by a mouse climbing inside them"; rats in the shower rooms); Affidavit of William Cannatin, October 2, 1992 ("The AB & F shower room has rats coming out of the drains and running around your feet."); Affidavit of Bruce Fournier, October 4, 1992 (roaches in abundance, mouse in his bed); Affidavit of Henny Moligmana, October 4, 1992 (roach infestation); Affidavit of Joseph DiBlasio, October 4, 1992 ("I notice very much of live action by the cockroaches crawling on & across the floors, walls, ceilings, desk, bed & other items in my cell." He works in the kitchen, where cockroaches and other insects are said to roam everywhere); Affidavit of Michael Vernaglia ("The cockroaches in here are multiple. One morning I woke up with one crawling on my arm. As clean as I keep my room they are still around."); Affidavit of David Sibinich, October 6, 1992 ("On September 22, 1992 when I was locked in for the evening, I was sitting on the bed

inmate states that he was bitten by a rat.[34]

### c. *The Defendants' Position*

The defendants do not specifically address pest infestation.

### d. *Conclusion as to the Vermin Problem*

The court concludes that the issue of pest infestation should go to trial. Because the complaint does not now specifically mention the problem, the defendants might well have concluded that they need not have addressed the issue in connection with the present motion.

### III. *Overall Conclusion*

In summary, the court concludes:

A. The plaintiffs are entitled to summary judgment as to the "objective test" of their Eighth Amendment claim with respect to the chemical toilets, both as it pertains to unsanitary conditions and as it pertains to illnesses caused by use of the chemical toilets. With respect to the question of whether the defendants acted with deliberate indifference regarding the chemical toilets, the plaintiffs' summary judgment motion is denied.

B. The court denies the plaintiffs' motion for summary judgment plaintiffs with respect to the alleged fire hazard.

C. The plaintiffs' motion for summary judgment is denied with respect to the water quality issue.

D. The plaintiffs' motion for summary judgment is denied with respect to the asbestos contamination issue.

So ordered.

---

eating a soup. It was then that I noticed a Large Rat running towards the door, but could not get out because it was of course locked. It then ran under the bed, I chased it out from under the bed, and trapped it with the cover of the light fixture, and proceeded to yell for the C.O. after awhile he came down and he opened the door and removed the rat."); Affidavit of Robert Munroe, October 31, 1992 ("Mice running over me while I was in bed. Mice getting into my locker and food.")

34. Affidavit of Joseph DiBlasio, October 4, 1992 ("On the day of Sept. 28, 1992 @ approx. 12:30 p.m. I was in the S.E.C.C. Md. shower room finishing my so called shower, when I stepped out of the shower & towled off and started to dress. I reached down to pick up my sneaker to put it on, when I felt a sharp pain on my thumb, I picked up my hand to inspect the problem & noticed a 6 inch long baby "rat" still attached to my thumb while it was bleeding ...)