**Larry D. FAMBRO, et al., Plaintiffs,**

v.

**FULTON COUNTY, GEORGIA, et al., Defendants and Third–Party Plaintiffs,**

v.

**DEPARTMENT OF OFFENDER REHABILITATION, et al., Third–Party Defendants.**

Civ. A. No. 1:82–CV–2136–JOF.

United States District Court, N.D. Georgia, Atlanta Division.

April 21, 1989.

Robert W. Cullen and Gary A. Ratner, Georgia Legal Services, Martha A. Miller and Steven Gottlieb, Atlanta, Ga., and Gary J. LeShaw, Atlanta Legal Aid Soc., Inc., Decatur, Ga., for plaintiffs.

W. Davis Hewitt, Barnett & Alagia, Allen I. Hirsch, Theodore H. Lackland and Karen S. Riddell, Arnall, Golden & Gregory, Richard H. Sinkfield and Peter W. Schneider, Rogers & Hardin, and Elizabeth E. Long, Gambrell, Clarke, Anderson & Stoltz, Atlanta, Ga., for defendants and third-party plaintiffs.

## OPINION

FORRESTER, District Judge.

This matter regarding current conditions at the Fulton County Jail came on before this court *ex mero motu* after the court received its monitor's tentative findings of fact dated April 11, 1989. This jail has been under a consent decree for the past five years. Within ninety days after entering into the consent decree Fulton County was in violation of that consent decree to major or minor extents and has been at all times since then. Some violations amount to a failure to file plans that would remedy problems. Other violations have been the maintenance of a population at the facility well in excess of that agreed to by the county.

At various times heretofore, in an effort to address persistent overcrowding, the court has authorized the sheriff in his discretion to release inmates under a prioritized release order and has imposed a fine of $100 per day for each inmate sleeping on the floor. Other efforts have been made by the county in a timid sort of way to select inmates who might be eligible for release. None of these efforts have succeeded in bringing the population of the jail down. Under constant pressure from the court and plaintiffs' counsel, the county added 100-plus beds at its correctional facility at Bellwood several years ago but otherwise seemed to do little to address the problem of persistent overcrowding. Finally, in January of 1988 the county took what the court considered a bold and commendable step in spending additional money to fast-track a portion of a new jail now under construction which added approximately 600 beds. The highest population in the jail during the month that that decision was made was 1,406, or about 225 in excess of the bed capacity of the jail. At that time the male population exceeded the rated capacity of the old jail by about 300 inmates. As can be seen at the time that it was decided to fast-track a portion of the new jail, the addition of 600 beds should have easily accommodated the population with the allowance of some substantial growth so that the act taken by the county should have solved major overcrowding problems until the new facility was ready sometime during 1989. Instead, the population of the jail rapidly increased to the point that in April of 1989 the population was regularly ranging between 2300 and 2400 inmates.

What no one at that time foresaw was the speed with which the cocaine epidemic was spreading in this area. While figures are not available to the court to indicate a population breakdown by offense, the court during a recent tour of the facility and after questioning numerous inmates developed a sense that seventy to eighty percent of the inmates awaiting an adjudication of guilt and housed at the Fulton County Jail are there because of distribution of drugs. It appears to the court based on the statistics available that the criminal justice system of the county was also ill-prepared for this phenomenon and has either not been able to adjust or not adjusted for it.

In considering just the felony cases, it would seem to this court that given the nature of the cases it would be reasonable to expect that almost all cases could be indicted within thirty days and tried within the next sixty days. However, based on January figures, there were 685 inmates in the Fulton County Jail whose cases remained unindicted for more than thirty days, and there were 248 inmates in the Fulton County Jail whose cases had been indicted who remained untried for more than sixty days; 183 of these had had cases indicted but untried for more than three months.

This court knows that the judges of Fulton County can obtain additional judicial help upon request and, therefore, supposes that it is not the absence of judicial resources which is causing this backlog. Based on evidence obtained by the court in a recent hearing on legal access of inmates, it is clear that the Fulton County Public Defender's Office is understaffed to the point that it might find it difficult to service more than the twelve sitting superior court judges. The District Attorney's Office seems fully staffed but contends that it has difficulties in bringing cases as quickly as it should because of the backlog at the Georgia State Crime Lab. The parties, however, have indicated that the district attorney has declined to take advantage of alternative drug testing which the commissioners have offered to make available. The court does not here intend to dissect the functioning of the criminal justice system in Fulton County, but it would point out that if it were capable of functioning at an attainable rate, no release of inmates would be necessary at this time.

There seems to be another problem in the criminal justice system which if addressed might also alleviate problems. First, from the representations of the parties it seems that those who set bonds require corporate bondsmen or property bonds in many cases where other conditions of release could be fashioned which would reasonably assure the presence of the defendant at trial. Second, it would seem that the overcrowding could be alleviated if those in authority who have the discretion to set bond in cases which are routinely regarded as "no bond" cases exercise that discretion. It seemed to the court upon its tour of the jail and interview with inmates that the overwhelming majority of the inmates have deep roots in the area and do not present serious flight risks. The dangers to the community that they may pose is best remedied by a swift adjudication of guilt and an appropriate committal to the state prisons.

### Present Conditions at the Fulton County Jail

The court's monitor, an expert proposed to the court by the county, in his recent interim report states that the rapid growth in the Fulton County Jail has put an "unsustainable burden on all of the support systems provided at the jail." He continues, "efforts to tame population growth have failed, and, in the face of climbing numbers, the jail's physical plant is deteriorating badly and inmates are becoming increasingly restive...."

The county sheriff gives evidence that "the now excessive number of inmates we are presently resigned to house has had a severely negative impact on medical services, food services, grievance and disciplinary procedures, maintenance service, sanitation service, library service, laundry service, inmate telephone privileges, inmate visitation services and inmate recreation privileges." He continues, "... due to this excessive population ... in my professional opinion the Fulton County Jail rests in an unsafe and insecure condition, making it difficult if not impossible to provide an adequate level of basic human services to the inmate population."

Among the many deficiencies the monitor found at the jail, three broad areas will be considered here by the court. They are 1) overcrowding, 2) medical services, and 3) sanitation. As noted earlier, there are now approximately 400 inmates sleeping on mattresses on the floor in cells and dormitories that are already full to design capacity. This means that it is virtually impossible to move about a cell without intruding on someone else's space or stepping on

one's cellmates. The locations of these mattresses frequently are in or around wash basins, urinals, toilets and showers or else consume the day room space meant for minimal in-cell recreation. In the women's area pregnant women are sleeping on the floor. The overcrowding puts stress on a staff which was already not properly conducting security rounds. The monitor reports that in early March ten inmates jumped one inmate and beat him badly to the point that his jaw was broken and his eye was swollen shut before any jail official was aware that a disturbance had occurred. There had been episodes of the classification program breaking down so that inmates are assigned in cells without reference to the appropriateness of the placement.

Medical services, believed to be inadequate for more than a year, are now providing service in three different institutions with the same resources that they had a year ago. In March the medical staff had a backlog of 313 screenings which meant that it routinely took eight days or more for the medical staff to initially see most inmates. The court judicially notices that the population in the Fulton County Jail contains intravenous drug users and homosexuals, patients with tuberculosis or other serious communicable diseases at rates of incident much higher than that for the general population. Without screening by medical personnel, the placement of incoming unscreened inmates creates a substantial hazard for the unnecessary transmission of serious or lethal communicable diseases. Adding to this problem of examination is the fact that in March the medical staff had a backlog for inmate physicals of twenty days. In recent times inmates have had to wait for up to three days for medication. Inmates who are dependent on pharmaceuticals for the hour-to-hour maintenance of their physical health and safety including those with epilepsy and diabetes are placed in risk of serious bodily injury or death by the shortcomings of the medical delivery system. Inmates suffering from more minor maladies such as colds, headaches and the like often have to wait for up to one week for over-the-counter medication. Inmates with class one dental problems such as acute pain or swelling, severe oral infections, traumatic dental injuries, or other serious pathological conditions are generally not seen by a dentist for over three weeks. Others with less acute dental problems are not seen for more than a month.

Medical records and charts are disorganized and sometimes incomplete. When follow-up care is rendered, doctors and physicians' assistants have difficulty in determining what if any prior treatment an inmate has received. There is no infirmary for female inmates who need medical supervision such as women with advanced or complicated pregnancies. Mandated training for jail staff is behind and only one-third of the staff is trained in cardiopulmonary resuscitation.

Almost from the beginning of this case the old Fulton County Jail has had major problems with sanitation. Plumbing maintenance ranged from non-existent to deficient, and regular housekeeping was carried out more or less on a hit-or-miss basis. Windows and air conditioning filters often are filthy, affecting the quality of light and air, both of which are at a minimum in the cells under the best conditions. Dust and grime build up on grills and bars as well as within the cells themselves. With the increased stress on the facility, toilets and showers are constantly breaking down. When there are no mops available, which is often the case, inmates are unable to keep the dormitories minimally clean, and because of the large numbers, direct supervision of cleaning by inmates is virtually impossible. When mops and brooms are not available, the cell floors are littered with cigarettes and the remnants of the latest meals.

The plumbing system is collapsing. Toilets in many cells are stopped up or leaking, shower heads do not work or drip constantly. When they do work, they often blast extremely hot or cold water. The maintenance staff cannot respond to fix most of these problems in a timely fashion, and by the time one problem is fixed, another has cropped up. Shower curtains are

mildewed and floors in the day rooms around the toilets and showers are constantly soaked with leaking water.

Some inmates are unable to get a pillow or a mattress until they have been in the jail for several days. Some cannot get sheets and pillowcases and so must sleep on soiled mattresses and pillows. Blankets are not cleaned regularly as washing machines and dryers are out of commission from excessive use. In recent months, the jail has run out of pants for inmates and were able only to issue clean shirts. On a few days, even shirts were unavailable. The kitchen, which is being presently utilized to feed a population of about 2400 inmates and 300 deputies, was designed to feed approximately 800 people. Because of what is needed to feed that many people, the food service contractor is unable to keep the kitchen area clean and on almost any day of the week rotten food and uncovered meat or vegetables can be found in food storage areas. The floor of the food service area is always filthy. Certain sewerage pipes in the kitchen continue to leak and the floor of the corridor leading to one storage area has such a build-up of grease as to cause the court's monitor to slip and fall.

### Conclusions of Law

The Fulton County Jail is a facility where both pretrial detainees and sentenced prisoners are incarcerated. Under the Constitution of this country the due process clause of the fourteenth amendment prohibits a state or county from punishing a pretrial detainee. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). *See also Block v. Rutherford,* 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). The eighth amendment's prohibition against cruel and unusual punishment is the standard for review for conditions of confinement with reference to sentenced prisoners. *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Under this amendment the conditions at a facility must not involve the wanton and unnecessary infliction of pain, or be grossly disproportionate to the severity of the crime. The court is guided by contempo-

rary standards of decency. The inquiry is whether the totality of the circumstances deprive the inmate of minimal civilized measures of life's necessities. *Reece v. Gragg,* 650 F.Supp. 1297 (D.Kan.1986). In this case the conditions just outlined are punitive to the pretrial detainee and cruel and unusual for the post-trial detainee, and the maintenance of these conditions serves no legitimate governmental function. There is no showing that the county could not earlier on have provided additional housing such as temporary units, there is no showing that the criminal justice system could not function more quickly, and there is no showing that the county or those involved in the criminal justice system have endeavored to exercise discretion so as only to house those who constitute a legitimate risk of flight or a realistic threat of harm to the community.

This court has forborne simple overcrowding for years thinking that sanctions in the nature of contempt sanctions might bring the county into compliance. During most of this time while jail systems supporting the population were strained, it did not appear that major systems had broken down and so this court has not in the past ordered release simply to remedy what some might call technical overcrowding. The overcrowding today is more serious in degree in that the population density of the old facility has markedly reduced the space available to each inmate and requires an increased number to sleep on the floor. Beyond that, this overcrowding has taxed the systems to the point that even the jail administrators admit that they are unable to service at minimal required levels the population they are charged with keeping.

Two of the systems that the court finds to be failing are the delivery of medical care and sanitation. The Constitution of the United States requires only that a jail not be deliberately indifferent to the medical needs of their inmates. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed. 2d 251 (1976). Deliberate indifference to serious medical needs is established where there are systematic deficiencies in the staffing facility's equipment or procedures

which effectively deny inmates access to adequate health care. *Cody v. Hillard,* 599 F.Supp. 1025 (D.S.D.1984).

The facts set out above establish that deficiencies in the medical system are subjecting other inmates to unnecessary risk of contracting dangerous or fatal communicable diseases, that inmates are having to suffer unnecessary pain and discomfort ranging from the common cold through major abscesses without help of medical science, and that whole classes of inmates that are dependent upon pharmaceuticals for the regulation and management of life-threatening conditions cannot predictably receive their medicine and sometimes must wait for up to three days to receive it. To operate under these parameters is to be indifferent to the health, comfort and even life of inmates who have no option of obtaining medical treatment elsewhere.

■ Jails are constitutionally obliged to provide reasonably adequate sanitation for their inmates. *Green v. Ferrell,* 801 F.2d 765, 771 (5th Cir.1986). This generally requires control of vermin and insects and clean places for eating, sleeping and working. *Rhodes v. Chapman,* 452 U.S. 337, 364, 101 S.Ct. 2392, 2408, 69 L.Ed.2d 59 (1980) (Brennan, J., concurring). In addition, it concerns such areas as food preparation, medical facilities, lavatories and showers. *Id.* When sanitary conditions are in question, the court must concern itself with whether substandard sanitation endangers the health of the jail occupants. *Johnson v. Galli,* 596 F.Supp. 135, 140 (D.Nev.1984); *Martino v. Carey,* 563 F.Supp. 984, 1000 (D.Or.1983). There is no information available to the court at this time to suggest that vermin and insects are not being controlled at the Fulton County Jail. It is clear beyond peradventure, however, that food is being prepared in unsanitary surroundings and that inmates are being required to live and sleep in and around seeping sewerage and in warm dark places which are not regularly and adequately cleaned, lit or ventilated. One does not have to have a degree in sanitation engineering to understand that the conditions in the Fulton County Jail are fully conducive to the development and transmission of bacteria both because of conditions in the cell, conditions in the kitchen, and the lack of the ability to provide for adequate personal hygiene.

■ For the foregoing reasons the court agrees with the monitor that the Fulton County Jail as it is being currently operated is unquestionably unconstitutional in these respects as well as others not mentioned herein. The only remedy that the court sees to this immediate crisis is the issuance of what is ordinarily termed a release order. The court is mindful that this is a last resort in the management of conditions of confinement cases and that ordinarily it should not insinuate itself upon the prerogatives of the county who does have the ultimate responsibility for operating a constitutional prison system. The court has considered the teachings of *Newman v. State of Alabama,* 683 F.2d 1312 (11th Cir.1982) and finds here that there are constitutional violations, that there is continuing irreparable injury to the inmates, and there is simply no other adequate remedy. The first remedy and the one ordinarily thought of is the setting of a cap and then the imposition of contempt sanctions if the cap is not honored. For all intents and purposes, this has been done and the fact that potential fines have been accruing for a period of years at between $10,000 and $40,000 per day has not solved the problem. Every other means to reduce the population which anyone has been able to think of has been tried, and they have failed. The new jail should be ready for occupation in the next four to nine months. It would be irresponsible of this court to require the county to go out at this point and construct temporary housing simply to alleviate the overcrowding. It may be that in the interim the county can come up with an effective population control mechanism which has not been thought of and that it can come up with additional medical services and housekeeping plans and the provisions of the order allow the county to come in and request the vacation of this release order at such time as it occurs. Otherwise, the release order as will be seen expires upon the full occupation of the new jail.

Further, the ultimate decision on who is released is, in the mind of this court, left to those who are charged with the protection of society. As will be seen in the release order itself, the judges of the superior and state courts of Fulton County will have an opportunity to veto the release of specific individuals if in their judgment such release should not be had and, therefore, to a major extent, the question of who is incarcerated is left in the hands of those who are ultimately responsible for the decision.

The court would take this opportunity to point out that at present population levels the new jail is not sufficient to handle the present inmate population requirements of the county. It is clear that the commissioners must now begin making plans for what appears to be a substantially higher population, and it is also clear that the resources and processes of the criminal justice system should be studied by those in control of that so that the cases are moved through the system with greater dispatch and the citizens of Fulton County are not being required to house prisoners, most of whom could be moved through the system to state facilities more quickly.

For the reasons stated in this opinion the court enters the attached order to govern the release of inmates from the Fulton County Jail.

### ORDER

#### A.

On Wednesday of each week that this Order is in effect, the Sheriff of Fulton County shall submit to the Chief Judges, or their respective designated judicial officers, of the Superior and State Courts of Fulton County the names of male inmates and, separately, the names of female inmates, incarcerated in the Fulton County Jail awaiting indictment, accusation or trial (the "Release Lists"). A copy of the Release Lists shall be sent simultaneously to the Fulton County District Attorney and the State Court Solicitor. The Release Lists shall reflect, in separate categories, those inmates who (1) have been incarcerated for more than 120 days; (2) have been incarcerated for less than 120 days and have been charged only with misdemeanor offenses; and (3) have been incarcerated for less than 120 days and have been charged with a felony offense. Within each of these separate categories, the inmates' names shall be ordered according to the date of their incarceration. For purposes of this Order, with respect to those persons confined on the date of entry of this Order, "incarcerate" or "incarceration" shall mean the date of commitment to the Fulton County Jail. For all persons committed to the Jail subsequent to this Order, the date of "incarceration" or "incarcerate" shall mean the date of arrest. The Release Lists also shall state the number of male inmates exceeding 1616 inmates and the number of female inmates exceeding 165 inmates.

#### B.

By 6:00 p.m. on Friday of each week, the Sheriff shall begin releasing inmates whose names appear on the Release Lists. The Sheriff shall effect the releases in the following order: first, the Sheriff shall release inmates who have been incarcerated for more than 120 days; second, the Sheriff shall release inmates who are charged only with misdemeanor offenses; and third, the Sheriff shall release inmates who are charged with a felony offense. Within each of these categories, inmates who have been incarcerated the longest shall be released first. The Sheriff shall continue releasing inmates pursuant to this Order until the male population reaches 1616 inmates and the female population reaches 165 inmates.

#### C.

The Sheriff shall not release an inmate if a Chief Judge, or the designated judicial officer, of the Superior Court or State Court directs him not to release that inmate, except as provided in Paragraph E below. The Chief Judges, or other designated judicial officers, shall make such direction by circling the name of the inmate on the Release Lists and delivering the marked list to the Sheriff prior to 6:00 p.m.

on the Thursday following their receipt of the lists.

### D.

In the event the Sheriff cannot release sufficient inmates to reduce the male population to 1616 inmates and the female population to 165 inmates, the Sheriff, by 9:00 a.m. Friday, shall resubmit the Release Lists to the appropriate judicial officers with a request that they approve sufficient numbers of inmates to reduce the population to the designated levels. They shall have until 12:00 noon on Friday to return the Release Lists to the Sheriff.

### E.

If after releasing inmates pursuant to paragraphs B, C and D above, the inmate population exceeds 1616 male inmates and 165 female inmates, then the Sheriff shall begin releasing the remaining number of necessary inmates in the order set forth in paragraph B without regard to the Chief Judges', or designees', directions until the population is reduced to the designated levels.

### F.

Before any inmate is released pursuant to this Order he or she shall sign his or her own recognizance bond.

### G.

This Order shall remain in effect until the new Fulton County Jail, currently under construction, is completed and fully occupied or until further order of this Court for good cause shown.

### H.

This Order is not intended as a ruling on, or resolution of, Plaintiffs' motion for contempt on issues relating to overcrowding. Plaintiffs' motion is hereby stayed until further order of the Court.

SO ORDERED.