Christopher MASONOFF,
Sr., et al, Plaintiffs,

v.

Larry DUBOIS, et al., Defendants.

No. CIV.A.94–10133–RCL.

United States District Court,
D. Massachusetts.

Sept. 17, 2004.

Christopher Masonoff, Sr., Norkolk, MA, Pro se.

Alan Joel Finkel, Herbert E. Zimmerman, Framingham, MA, for Plaintiffs.

Robert Foster, Pro se.

Anthony Smith, Roxbury, MA, Pro se.

Michael Tarrant, Bridgewater, MA, Pro se.

Michael C. Donahue, Michael C. Donahue P.C., South Easton, MA, for Defendants.

William C. Marangiello, Bridgewater, MA, Pro se.

Robert C. Desrosiers, Bridgewater, MA, Pro se.

Robert M. Bruzzese, Bridgewater, MA, Pro se.

David I. Carroll, Bridgewater, MA, Pro se.

Henry Varney, Gardner, MA, Pro se.

William Marangiello, Bridgewater, MA, Pro se.

Robert Gendreau, Quincy, MA, Pro se.

Bruce Wallace, Bridgewater, MA, Pro se.

Shawn Hickey, Bridgewater, MA, Pro se.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

LINDSAY, District Judge.

### I. Introduction

This matter was brought as a class action by inmates formerly incarcerated at the Southeast Correctional Center ("SECC") located in Bridgewater, Massachusetts, to challenge the conditions of confinement at that institution. Specifically, the plaintiffs claim that unsanitary toilet facilities, fire hazards, contaminated drinking water, and exposed asbestos in existence at SECC at the time of their confinement violated their rights under the Eighth Amendment to be free from cruel and unusual punishment.

For purposes of the declaratory and injunctive relief sought by the plaintiffs, I certified a class consisting of all inmates confined at SECC at any time during the period January 1, 1977 to July 1, 2002.[1] The defendants are: Larry DuBois, Commissioner of Correction in Massachusetts from July 1991 to July 1997; Lynn Bissonnette, Superintendent of SECC from July 1993 to June 1996; and Richard G.J. Grelotti, Complex Administrator of the Bridgewater Correctional Complex (a facility that included SECC) from 1991 to February 1994.

On December 13, 1994, I bifurcated this matter. In phase one, the parties were to address all questions of liability and the appropriateness of any declaratory and injunctive relief. In phase two (for which no class was certified), the individual plaintiffs and the defendants were to address the question of monetary relief to the plaintiffs if liability and damages were established. During phase one of these proceedings, I determined that the use of chemical toilets violated the objective prong of the Eighth Amendment's prohibition of cruel and unusual treatment, and that there were triable issues of fact as to the subjective prong—that is, whether the defendants acted with deliberate indifference to the plaintiffs' rights regarding the cleaning and maintenance of the chemical toilets. I also determined that there were genuine issues of material fact as to whether the

alleged fire hazards, drinking water contamination, and asbestos contamination violated the Eighth Amendment. See Masonoff I, 899 F.Supp. at 802.[2]

Now before me are the defendants' motion to dismiss, on mootness grounds, the claims for declaratory and injunctive relief and the defendants' motion for summary judgment on grounds of qualified immunity. In their motion to dismiss, the defendants assert that the plaintiffs' claims for declaratory and injunctive relief are moot because the medium security facility at SECC was closed on July 1, 2002, and all its inmates were transferred to other facilities. The plaintiffs concede that their claims for all but monetary damages are moot. Thus, I GRANT the defendants' motion to dismiss as moot the plaintiffs' claims for declaratory and injunctive relief.

In their motion for summary judgment, the defendants argue that they are entitled to qualified immunity with respect to the named plaintiffs' Eighth amendment claims regarding the chemical toilets.[3] In the alternative, the defendants seek summary judgment in their favor on the merits of the issue of deliberate indifference, insofar as the plaintiffs' claims relate to the chemical toilets. On the record now before me and for the reasons stated below, I decide that, as to the claims arising from the use of chemical toilets at SECC, the defendants Bissonnette and Grelotti

---

1. As originally certified, the class consisted of "all inmates confined at SECC at any time from January 1, 1977 to the present." *Masonoff v. DuBois*, 899 F.Supp. 782 (D.Mass. 1995) (hereinafter *Masonoff I*). As thus defined, the class would include any inmate confined at SECC from January 1, 1977 to the date any permanent declaratory and injunctive relief was ordered. As noted later in this memorandum and order, SECC was closed on July 1, 2002. That date therefore became the end date of the class period.

2. The issues surrounding the chemical toilets and the alleged fire hazards, drinking water contamination and asbestos contamination are discussed in detail in *Masonoff I*.

3. The defendants do not raise, in the present motion, any claim of qualified immunity as to the alleged fire and asbestos hazards and the claim of water contamination. Those claims are likely moot, given the closure of SECC and the assertion by the plaintiffs that the injuries they suffered are due to the alleged failure to maintain the chemical toilets in safe and sanitary condition.

are not entitled to qualified immunity. I also affirm my previous conclusion that there are triable factual issues regarding the alleged deliberate indifference of Bissonnette and Grelotti to the risks posed by the use of chemical toilets at SECC. Thus, I DENY the motion for summary judgment with respect to these defendants. Because I conclude that the plaintiffs have provided no evidence that the defendant Dubois had actual knowledge of serious health risks posed to the plaintiffs, I GRANT the defendants' motion with respect to him.

When I certified the plaintiffs' class for purposes of declaratory and injunctive relief, I denied a number of motions of individual inmates to intervene in their own names. There has been no motion to certify a class for purposes of monetary damages.[4]

I will dispense with the customary recitation of the facts. They are set out in detail in *Masonoff I*. I hereby incorporate the facts set out there and will refer to them and any new facts, as needed, to resolve the motions now before me. My inquiry here will be limited to the issue of qualified immunity.

## II. Qualified Immunity

The defendants claim that they are entitled to the defense of qualified immunity, which would bar the plaintiffs' claims for monetary damages. In essence, the defendants argue that they were entitled to rely on the holding in *Langton v. Fair*, No. 86–

24234 (Mass.Super.Ct.1991), *aff'd sub nom Langton v. Comm'r of Correction*, No. 93–P–1635 (Mass.App.Ct.1995),[5] a state court ruling in which the court held that the conditions attending the case of the chemical toilets at SECC did not constitute cruel and unusual punishment under the Eighth Amendment.

"Qualified immunity specially protects public officials from the specter of damages liability for judgment calls made in a legally uncertain environment." *Ryder v. United States*, 515 U.S. 177, 185, 115 S.Ct. 2031, 132 L.Ed.2d 136 (1995). The defense shields government officials from paying monetary damages when "their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

To determine whether the defendants here are entitled to the shield of qualified immunity, I must inquire: "(1) whether the facts as alleged make out a constitutional violation; (2) whether that right was clearly established; and (3) whether a similarly situated reasonable official would have understood that her conduct violated clearly established law." *Fabiano v. Hopkins*, 352 F.3d 447, 453 (1st Cir.2003).

### A. Was there an Eighth Amendment Violation?

Taking the facts alleged in the light most favorable to the plaintiffs, I first consider whether the governmental con-

---

4. I note also that the named defendants had no responsibilities at SECC prior to 1991. These defendants may not be held liable for any potential monetary damages arising from the actions or inaction of their predecessors.

5. The Superior Court's memorandum of decision in *Langton v. Fair* cannot be found in any print or electronic source, but a copy of it was provided by the defendants. *See* "Memorandum of Decision," Exhibit A, Affidavit of Judith Buckley Hayman, Docket No. 184. Mul-

tiple orders were issued in this case. A March 25, 1991 "Notice of Decision" is located in the record at App. A, Mem. in Supp. of Defs.' Mot. for Summ. J., Docket No. 359. A May 16, 1991 "Order" is located in the record at Exhibit B, Aff. of Judith Buckley Hayman, Docket No. 184. Unless otherwise stated, any mention of *Langton* is meant to refer to the Superior Court's "Memorandum of Decision," and will employ the pagination of the copy found in the Hayman Affidavit.

duct at issue violated the Eighth Amendment. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). As I have pointed out previously in this case, an Eighth Amendment claim has both objective and subjective components. *See Masonoff I,* 899 F.Supp. at 787–88 (quoting *DesRosiers v. Moran,* 949 F.2d 15, 18 (1st Cir.1991)). In *Masonoff I,* I found that the conditions attending the use of chemical toilets at SECC were so unsanitary as to deprive inmates of essential human needs, as those needs are defined by contemporary standards of decency. *See id.* at 797; *see generally Helling v. McKinney,* 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). Accordingly, I granted summary judgment to the plaintiffs on the objective prong of the Eighth Amendment inquiry. I also ruled that there were triable issues of fact with respect to the subjective component of the claimed Eighth Amendment violation, namely whether the defendants were deliberately indifferent to the plaintiffs' constitutional rights. *See Masonoff I,* 899 F.Supp. at 798.

The conclusions reached in *Masonoff I* generally suffice to dispose of the first step in the qualified immunity inquiry: whether the facts alleged establish an Eighth Amendment violation. Subsumed in my conclusions that the plaintiffs had established the objective prong of their Eighth Amendment claim and that there were trialworthy issues regarding the subjective prong was a predicate observation that the facts, taken in the light most favorable to the plaintiffs, did indeed establish an Eighth Amendment violation. The defendants, however, have put the question of their deliberate indifference in issue again in the context of their assertion of the qualified immunity defense. Although I am reluctant to reconsider conclusions I reached, at least implicitly, in 1995, I do so here for the sake of completeness, in my consideration of the question of qualified

immunity. Consequently, I review the record anew, but in the present context, I explicitly view favorably only the facts as alleged by the plaintiffs. *See Saucier,* 533 U.S. at 201, 121 S.Ct. 2151.

■ "The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.' " *Farmer v. Brennan,* 511 U.S. 825, 843, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Helling,* 509 U.S. at 35, 113 S.Ct. 2475). To establish deliberate indifference, the plaintiffs must show "that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842, 114 S.Ct. 1970. The First Circuit has articulated the inquiry in such a way as to collapse the objective and subjective prongs into one three-part test for deliberate indifference. The plaintiff must show (1) a substantial risk of serious harm; (2) the defendants' actual knowledge of that elevated risk; and (3) the defendants' failure to take obvious steps to address that risk. *See Manarite v. City of Springfield,* 957 F.2d 953, 956 (1st Cir. 1992). In *Masonoff I,* I concluded that the first of these, the existence of a substantial risk of serious harm, was met by the plaintiffs' prodigious evidence of health problems and unsanitary conditions associated with the use of the chemical toilets. *See* 899 F.Supp. at 797. That evidence, leading to the conclusion that the objective prong had been met, was discussed at length in *Masonoff I.* I need not rehearse it here. *See id.* at 788–797.

A few words more are in order here, however, with respect to the second component of the deliberate indifference test— knowledge, on the part of the defendants, of the elevated risk. My discussion of the defendants' knowledge was brief in *Masonoff I;* that discussion was designed only to highlight the disputed

material facts that precluded the defendants' motion for summary judgment.

The defendants' state of mind is a question of fact:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Farmer*, 511 U.S. at 842, 114 S.Ct. 1970 (internal citations omitted).

In *Masonoff I*, I concluded, based upon the undisputed facts, that the conditions at SECC were "grossly unsanitary," "indecent," and "uncivilized." *See* 899 F.Supp. at 797. That conclusion was based upon uncontroverted evidence, including evidence that the SECC inmates were required to empty their "Pak–a–Potti" chemical toilets into a slop sink; that unsanitary conditions pervaded the slop sink and many of the inmates' cells; that the cells at SECC were permeated with the smell of human waste; that inmates experienced rashes, headaches, vomiting and other ill effects; that inmates' contact with fecal matter in the chemical toilets, both within the cell and during the emptying process,

caused the inmates to experience health problems; and that the paraformaldehyde-containing chemicals used in the toilets are toxic and cause health problems. *Id.* at 796. Thus, it can be fairly said that these conditions created an obvious and substantial risk of serious harm to the inmates' health.

Moreover, as to defendant Bissonnette, it is undisputed that she supervised the day-to-day operations of SECC. She has stated in an affidavit that she was "concerned about the implementation of [a state court judge's] order relating to the chemical toilets,"[6] that she "walk[ed] the institution on a regular basis," and that she assessed the physical condition of the units "not less than once weekly." *See Masonoff I*, 899 F.Supp. at 795. Given the obviousness of the unsanitary conditions created by the use of the chemical toilets (including the stench), and Bissonnette's frequent surveillance of the institution, one can easily conclude that she was aware that the conditions of the chemical toilets seriously endangered the health of the inmates.[7]

Similarly, there is direct evidence of Grelotti's knowledge of the health risks caused by the chemicals used in the toilets. The plaintiffs have previously offered a

---

6. Bissonnette was referring to the order in the *Langton*, which I will discuss in more detail later.

7. Bissonnette has made an effort to show that, notwithstanding the obviousness of the sanitation problems at SECC and her regular assessment of the physical condition of the institution, she was unaware of any risk posed by the chemical toilets, because no one complained about the problem. That response, however, will only go so far in establishing absence of knowledge. *See Farmer*, 511 U.S. at 848–49, 114 S.Ct. 1970 (holding, in a failure-to-protect case, that an inmate need not have complained to prison officials about being in danger, and noting that a plaintiff may establish awareness by relying on any rele-

vant evidence). Furthermore, as I pointed out previously, it seems odd that Bissonnette would be unaware of any inmate complaints when her subordinates have admitted to receiving complaints from inmates regarding the ill health effects of the chemical toilets. *See Masonoff I*, 899 F.Supp. at 797 n. 28. Of course, for purposes of the analysis required to assess the qualified indemnity defense, Bissonnette's assertion that she was unaware of heath risks posed by the use of the chemical toilets is largely beside the point, because, I must view the allegations in favor of the plaintiffs, who claim injury. *See Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. Bissonnette's claimed unawareness of any health risk associated with the chemical toilets is a matter to be resolved at trial.

letter Grelotti wrote in 1993, responding to an Administrative Order of the Environmental Protection Agency regarding water pollution. In that letter Grelotti states that he is aware that the disinfectant used in the toilets contains paraformaldehyde, which he knows to be "very toxic to many forms of life." *See Masonoff I,* 899 F.Supp. at 792.

Consequently, I conclude that the facts as alleged suffice to establish that both Bissonnette and Grelotti had actual knowledge of the health hazards posed by the unsanitary conditions attending use of the chemical toilets.

Finally, taking the plaintiffs' assertions in the light most favorable to them, the record shows that the defendants failed to take obvious steps to reduce a known risk to the plaintiffs' health. The unsanitary conditions at SECC are alleged to have been unremitting over the course of several years.[8] Furthermore, the inmates, in their affidavits, claim that the administration did nothing to respond to their complaints or to alleviate the conditions at SECC.[9]

Bissonnette and Grelotti argue that they did everything in their power to remedy any problems associated with the chemical toilets at SECC. They essentially argue that the conditions at SECC were due to overcrowding— a problem that they meticulously documented throughout the

1980's and 90's—– and to the inadequate response of a parsimonious administrative agency and a recalcitrant legislature, both of which balked at the expense and onus of the necessary, proposed construction projects. The crux of the defendants' argument is that they are not liable for circumstances over which they have no control.

The law is frustratingly murky on the question of whether government officials sued in their individual capacities may defend against an Eighth Amendment claim on the ground that, "despite good-faith efforts to obtain funding, fiscal constraints beyond their control prevent the elimination of inhumane conditions." *See Wilson v. Seiter,* 501 U.S. 294, 301–02, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (noting that the "validity of a 'cost' defense as negating the requisite intent" was not at issue in the case and pointing out that there was no indication that any officials had ever mounted such a defense); *see also Cortes–Quinones v. Jimenez–Nettleship, et al.,* 842 F.2d 556, 561–62 (1st Cir.1988) (Breyer, J.) (noting, in an Eighth Amendment case, that public policy might be well served by a denial of qualified immunity to defendants asserting a cost defense because "indemnification by the state has the effect of transferring some of the human cost of the system, borne in the form of death and misery, to the public treasury, and thereby, perhaps, making the public

8. *See, e.g.,* Aff. of Lorenzo Scott, Nov. 27, 1992 (stating that in the course of his four-month stay at SECC, "[t]he facilities are not properly working at any given time."); Aff. of Michael J. Coulter, Nov. 30, 1992 (writing about health problems resulting from use of the Pak–A–Potties from 8/27/91 to 11/30/92).

9. *See, e.g.,* Aff. of Lorenzo Scott, Nov. 27, 1992 ("The Administration [sic] does not seem to adhere to the complaints or conditions that are brought before them."); Aff. of Alan R. Gaudreau, Oct. 30, 1992 ("The administration is well awear [sic] of [his concerns about the sanitation procedures for the

Pak–A–Potties] but refuse to do anything about it."); Aff. of Harry Seymour, Nov. 30, 1992 ("It is my observation that throughout the institution that there is a continuous covering over of filth and dirt, rather than a unified regimen of daily house keeping and cleaning. My observation is that policy is to let area go uncleaned and paint over it when it looks bad or when outside people are touring the area."); Aff. of James Doane, Mar. 26, 1993 (recounting his efforts, over the course of four days, to replace a broken Pak–A–Pottie and stating that he was told there were none available).

more aware of those costs, and encouraging change"); *Kosilek v. Maloney*, 221 F.Supp.2d 156, 182 (D.Mass.2002) (rejecting a "cost defense" in a case involving the failure to provide adequate medical care); *but cf., Houston v. Sheahan*, 62 F.3d 902–03 (7th Cir.1995) (per curiam) (holding that prison officials should not be made to pay damages for the consequences of legislative and judicial decisions), *abrogated in part by Haley v. Gross*, 86 F.3d 630, 641–42 (7th Cir.1996) (criticizing *Houston's* language requiring that a prisoner making a deliberate indifference claim establish intent to harm).

I am not required to resolve this nettlesome constitutional question in this case, however, because in the circumstances here, a "cost defense" would not be available to the defendants, in any event. While it may not be clear whether prison officials can be held liable for conditions beyond their control, it is clear that they are responsible for matters *within their control*. The First Circuit has been unequivocal:

> Prison officials ... understand that they are *not* liable for much of the harm that the system causes *only* because much of that harm involves matters beyond their individual control—appropriations decisions, for example, are in the hands of the legislature. Yet that fact, in the context of an unconstitutionally dangerous system, should make reasonable officials increasingly sensitive to the need to

avoid those acts or omissions, *within* their control, that might make matters worse.

*Cortes–Quinones*, 842 F.2d at 562 (internal citation omitted).

The materials submitted in support of the defendants' motion are primarily concerned with establishing that the defendants persistently documented the overcrowding problems at SECC and attempted to obtain funding for an in-cell toilet construction project. They are, as the defendants themselves proffer, "substantially identical to the materials submitted in the *Ahearn* case." Memorandum in Support of Defendants' Motion for Summary Judgment, Docket No. 357, at 1. Here, the defendants refer to a state court case, *Ahearn v. Vose*, No. 90–4619, 1999 WL 68517 (Mass.Super.1999), a class action filed in 1990 by other former SECC inmates. In *Ahearn*, the plaintiffs claimed that their conditions of confinement violated the Eighth Amendment, in that the lack of either a flush toilet or a sink with running water in their single-occupant cells constituted cruel and unusual punishment. *See id.* at \*1. In its most recent decision on the matter, the Superior Court concluded that the plaintiffs' § 1983 claims were barred by qualified immunity, and the court expressly declined to decide whether the lack of flush toilets constituted an Eighth Amendment violation.[10] *See Ahearn v.*

---

**10.** I respectfully suggest that, in making that decision, the Superior Court failed to follow the sequential rule in cases alleging constitutional violations. *See Saucier*, 533 U.S. at 201, 121 S.Ct. 2151 (holding that "the initial inquiry" for a court, called upon to rule upon the qualified immunity issue, is whether the facts alleged show the violation of a constitutional right); *see also Fabiano*, 352 F.3d at 453 (holding same). Constitutional law is seldom black and white, and, in the interest of narrowing the grey area of uncertainty, government officials need guidance from the

judiciary about where along the constitutional continuum their conduct falls. If courts were to look to whether a law was clearly established without first deciding whether the conduct at issue violates the Constitution, government officials would perpetually violate individual rights unwittingly and with impunity, and Eighth Amendment law would stagnate. *See generally Santana v. Calderon*, 342 F.3d 18, 29 (1st Cir.2003) (noting that the "sequential rule" established by the Su-

*Vose,* No. 90–4619, 1999 WL 68517 (Mass.Super.2003).[11] The court's decision was based, in part, on its unwillingness to hold state officials liable for conditions caused by funding deficiencies when it was shown that the officials had lobbied for capital funds to start a construction project for in-cell toilets. *See id.* at 28. The court also noted, importantly, that it would not consider the plaintiffs' belated argument that the defendants *could* be held liable for failure to ensure the proper maintenance of the chemical toilets and slop sinks. *See id.* at 29.

In arguing that I should follow *Ahearn,* the defendants have ignored what the court in *Ahearn* took pains to spell out. The *Ahearn* court considered *only* whether the defendants could be held liable for the absence of in-cell flush toilets, and did not consider precisely what is at issue here: the maintenance and cleaning of the chemical toilets and slop sinks. The defendants' efforts, however persistent and well-intentioned, to obtain funding for an in-cell construction project are of little relevance to the question of their liability for any "acts or omissions, *within* their control," directed to preventing and remedying unsanitary conditions at SECC. *Cortes–Quinones,* 842 F.2d at 562. The maintenance and cleaning of the chemical toilets are matters that fall within the defendants' control. *See id.* at 561–62 ("Even if the defendants *thought* they did not violate the decree in so far as compliance involved matters beyond their control (*e.g.,* hiring more staff, obtaining increased appropriations), we do not see how they

could have believed it lawful to violate the decree ... in respect to matters that were *within* their control ...").

Thus, even if I were to consider the facts proffered by the defendants in their materials—facts that the plaintiffs do not dispute—my conclusion as to the availability of any cost defense would be no different. The defendants' materials simply do not address the central complaint in this case, namely that the defendants did nothing to alleviate obvious sanitation problems associated with the cleaning and maintenance of the chemical toilets.

For present purposes, then, the plaintiffs' allegations are sufficient to establish the deliberate indifference element of an Eighth Amendment claim as to Bissonnette and Grelotti.

■ The circumstances for defendant DuBois are different. DuBois was the Commissioner of Correction for Massachusetts from 1991 to 1997. As such, he presumably did not have day-to-day contact with the operations and conditions at SECC, and there are no other facts in the record to support an inference of actual knowledge. Because one cannot infer knowledge from obviousness unless there is reason to believe that the defendant was confronted with the obviously harmful conditions, I conclude that the plaintiffs have not established a violation of the Eighth Amendment by defendant DuBois. *Farmer,* 511 U.S. at 844, 114 S.Ct. 1970 ("[P]rison officials who lacked knowledge of a risk cannot be said to have inflicted punishment."). Thus, the defendants' motion for summary judgment is GRANTED with respect to defendant DuBois.[12]

preme Court reflects concerns about developing guidelines for official conduct).

**11.** The state court's memorandum of decision ("Memorandum of Decision and Order on Defendants' Renewed Second Motion for Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment") is not available in any reporter or electronic database. A copy may be found in the materials submitted

by the defendants. *See* Appendix A, Affidavit of Counsel, Docket No. 360. In any citation to *Ahearn* in this Memorandum and Order, I will use the pagination of the copy found in Appendix A.

**12.** Dubois also is not liable merely because he was the supervisor of the other defendants. It is well established that, in § 1983 actions, a

## B. Was the right clearly established?

Having determined that the plaintiffs have established an Eighth Amendment violation with respect to defendants Bissonnette and Grelotti, I must next consider whether the right was clearly established at the time of the alleged violation. *See Savard v. Rhode Island*, 338 F.3d 23, 28 (1st Cir.2003) (assessing the contours of the law at the time of the alleged act or omission).

In conducting this inquiry, I must look first to the controlling authority of the Supreme Court and of the First Circuit to assay the extent to which the relevant legal rules were clearly established at the relevant time. *See id.* If there are no authorities on point within these sources, I may then look to authorities outside the First Circuit to see whether there was a consensus among them. *See id.* It is "vital" to undertake this task "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. Thus, I must define the right "at the appropriate level of specificity" before I "can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). "[O]vercoming a qualified immunity defense," however, "does not require a plaintiff to show that either the particular conduct complained of or some materially indistinguishable conduct has previously been found unlawful." *Savard*, 338 F.3d at 28. Even so, "the relevant legal rights and obligations must be particularized enough that a reasonable official can be expected to extrapolate from them and conclude that a certain course of conduct will violate the law." *Id.; see also United States v. Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)

("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very act in question has not previously been held unlawful.") (internal quotation and citation omitted).

■ Here, the plaintiffs seek redress for the defendants' failure to maintain reasonably adequate, non-toxic, and sanitary means to dispose of human waste. The right to "adequate and hygienic means to dispose of [a prisoner's] bodily wastes" was clearly established at the time of the violation, which began, with respect to Bissonnette and Grelotti, in 1991.[13] *Strachan v. Ashe*, 548 F.Supp. 1193, 1205 (D.Mass. 1982) (holding in 1982 that the right was clearly established by at least 1979). Although I can find no First Circuit authority holding unlawful the precise conduct at issue in this case, the First Circuit long ago held that "the prison administration must see to it that unsanitary conditions do not continue unabated [just] because the conditions were first caused by the inmates themselves." *Blake v. Hall*, 668 F.2d 52, 59 (1st Cir.1981). Furthermore, a chorus of courts in other jurisdictions had held by 1991 that prisons must provide reasonably sanitary facilities, especially when the inmates are confined for long periods of time. *See, e.g., Williams v. Griffin*, 952 F.2d 820, 824–25 (4th Cir. 1991); *McCord v. Maggio*, 927 F.2d 844, 848 (5th Cir.1991); *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir.1989); *Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir.1989); *Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir.1980); *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir.1972); *Gilland v. Owens*, 718 F.Supp. 665, 684 (W.D.Tenn.

---

supervisor may not be held responsible via a *respondeat superior* liability theory. *Monell v. Dept. of Soc. Serv. of New York*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

**13.** For these defendants, the earliest year in which the violation could have occurred was 1991, when defendant Grelotti began supervising operations at Bridgewater.

1989); *Fambro v. Fulton County, Ga.*, 713 F.Supp. 1426, 1431 (N.D.Ga.1989); *Inmates of Occoquan v. Barry*, 717 F.Supp. 854, 866–67 (D.D.C.1989); *Tillery v. Owens*, 719 F.Supp. 1256, 1271 (W.D.Pa.1989), *aff'd*, 907 F.2d 418 (3d Cir.1990). By 1992, the chorus had grown louder. *See, e.g., Young v. Quinlan*, 960 F.2d 351 (3d Cir. 1992); *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir.1992).

By 1983, the Supreme Judicial Court of Massachusetts had held that when prisoners must "eat and sleep next to buckets into which they must urinate and defecate," the prison conditions, including the procedure for emptying the buckets, constituted cruel and unusual punishment. *See Michaud v. Sheriff of Essex County*, 390 Mass. 523, 533, 458 N.E.2d 702 (1983). The Supreme Court of the United States had also made it clear that the conditions of confinement may not deprive inmates of "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Consequently, I think it too plain to be reasonably questioned that, by 1991 it was clearly established that reasonably adequate "sanitation is one of the basic human needs guaranteed by the [E]ighth [A]mendment." *Tillery*, 719 F.Supp. at 1271.

## C. Would a similarly situated reasonable official have understood that his/her conduct violated clearly established law?

If, at the time, "the law was clearly established, the immunity defense *ordinarily* should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims *extraordinary circumstances* and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained." *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct.

2727, 73 L.Ed.2d 396 (1982) (emphasis added).

The defendants claim that they were not on notice that their conduct was unlawful because they were entitled to rely both upon the 1991 decision in *Langton*, in which the court held that the use of the portable toilets at SECC satisfied Eighth Amendment standards, and upon their attorney's opinion that the conditions at SECC were constitutional. The question for me is whether, given the facts of this case, the decision in *Langton* and advice of counsel constitute extraordinary circumstances such that the defendants "should not be imputed with knowledge of a clearly established right." *See Cannon v. City & County of Denver*, 998 F.2d 867, 874 (10th Cir.1993).

The First Circuit and courts in other jurisdictions have held that a state law sanctioning the conduct at issue can keep a reasonable official from knowing the relevant constitutional standard. *See Malachowski v. City of Keene*, 787 F.2d 704, 713–14 (1st Cir.1986); *see also Roska v. Peterson*, 328 F.3d 1230, 1251–52 (10th Cir.2003); *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir.1994). Similarly, courts have also deemed reliance on advice of counsel reasonable under certain circumstances. *See Roska*, 328 F.3d at 1253–54; *Dixon v. Wallowa County*, 336 F.3d 1013, 1019 (9th Cir.2003). Ultimately, the question here boils down to whether it was objectively reasonable for these defendants to believe, based upon *Langton* and advice of counsel, that their conduct conformed to law. *See Harlow*, 457 U.S. at 818–19, 102 S.Ct. 2727.

*Langton* presented facts very similar to the present case. After over five days of testimony and two visits to the prison, the court in that case ruled that the toilet conditions at SECC did not constitute cruel and unusual punishment and that the

plaintiffs were not entitled to monetary damages. *See Langton* at 2–3.[14]

Nevertheless, the court, exercising its discretionary equity authority, granted injunctive relief to the plaintiffs and required officials at SECC to provide hand washing basins to each inmate and to inspect the portable toilets "at least twice per month, for maintenance, cleanliness and sanitary conditions." *See Order, Langton v. Fair* (May 16, 1991).[15] Additionally, the court issued specific directions regarding the inspection, cleaning, and replacement of the Pak–A–Pottis. See *id.* The court said the following:

> The court finds that the plaintiffs have not been subjected to cruel or unusual punishment in violation of the Massachusetts Constitution or the United States Constitution.... I will, however, issue a narrow order ... related only to fire safety programs and cleaning facilities maintenance for the portable toilets. Because there have been no constitutional violations, my order will issue solely as a discretionary exercise of equity jurisdiction. *The purpose of this order will be to provide a continuing assurance to the court that fire safety and portable toilet conditions do not approach a violation of minimum constitutional standards.*

*See Langton* at 2 (emphasis added).[16] Based on the court's ruling, an attorney with the state Department of Correction ("DOC") advised prison officials and inmates that the "utilization of portable toilets at SECC has been litigated and has passed judicial scrutiny." *See* Statement of Undisputed Material Facts, ¶ 36, Docket No. 358. In her affidavit, defendant Bissonnette (but, notably, not defendant Grelotti) states that she was aware of and relied upon *Langton* and the DOC attorney's conclusions regarding it.

There is, however, only one reasonable way to interpret *Langton.* Although the court did not find that the conditions at SECC in 1991 were so substandard as to be unconstitutional, it did find that the conditions warranted the issuance of a prophylactic order to ensure that those conditions would not "approach a violation of minimum constitutional standards." Accordingly, I reach a conclusion opposite of the one the defendants urge. I conclude that *Langton* gave the defendants more than "fair notice" that the portable toilets and slop sinks must be kept clean and well-maintained in order to pass constitutional muster. *Langton* merely states that, based upon the evidence before the court at the time (namely, the court's observations that the toilets were sanitary and in good working condition and testimony that sufficient hot water and cleaning supplies were provided), use of the portable toilets was not cruel and unusual punishment.

*Langton* did not give SECC a clean bill of constitutional health into perpetuity. In other words, it would not be reasonable for the defendants to rely on *Langton*—or advice of counsel—for the proposition that the conditions at SECC would always be constitutional, especially in the face of the court's warning in *Langton* and its prophylactic order regarding cleaning and maintenance of the portable toilets. Thus, my ruling does not, in fact, conflict with *Langton.* The plaintiff's allegations before me are that, notwithstanding the injunction in *Langton*, the chemical toilets were not maintained in safe and sanitary condition. Thus, as I have explained once before in this case, it is the difference in the record

---

14.   *See supra* note 5.

15.   *See supra* note 5.

16.   *See supra* note 5.

before me, and not any different application of the law governing it, that dictates an outcome different from that reached by the court in *Langton.* *See Masonoff I,* 899 F.Supp. at 797 n. 27.

### III. Conclusion

The defendants' motion for summary judgment is GRANTED as to defendant DuBois and DENIED as to defendants Bissonnette and Grelotti. The defendants' motion to dismiss the claims for declaratory and injunctive relief is GRANTED. This order resolves all pending motions. The clerk shall schedule this matter for an early status conference at which the parties and I will discuss procedures for the prompt disposition of the damages claims of the plaintiffs that remain following the rulings here.

IT IS SO ORDERED.